IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

APPEAL NO. 18-14184-E

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BERNANDINO BOLATETE,

Defendant-Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA

---

INITIAL BRIEF OF APPELLANT

---

Donna Lee Elm
Federal Defender

Rosemary Cakmis
Appellate Chief

Lynn Palmer Bailey
Research and Writing Attorney
Appellate Division
Florida Bar Number 0605751
200 W. Forsyth Street, Suite 1240
Telephone: 904-232-3039
E-mail: lynn_bailey@fd.org
Counsel for Appellant

**Appeal No. 18-14184-E**

*United States of America v. Bernandino Bolatete*

CERTIFICATE OF INTERESTED PERSONS

The persons listed below have an interest in the outcome of this case:

Bailey, Lynn Palmer

Bolatete, Bernandino Gawala

Cakmis, Rosemary

Coolican, Michael

Elm, Donna Lee

Grant II, Maurice C.

Islamic Center of Northeast Florida

Lopez, Maria Chapa

Muldrow, W. Stephen

Rhodes, David

Rosenblum, Mark

Schlesinger, The Honorable Harvey E.

Seider, Germaine M.

C1 of 2

## Appeal No.  18-14184-E

### *United States of America v. Bernandino Bolatete*

### CERTIFICATE OF INTERESTED PERSONS (*continued*)

Taylor, Laura Cofer

Toomey, The Honorable Joel B.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Bolatete respectfully requests oral argument.

## Table of Contents

Certificate of Interested Persons ............................................. C1

Statement Regarding Oral Argument ......................................... i

Table of Contents ................................................................ ii

Table of Authorities............................................................. v

Statement of Subject Matter and Appellate Jurisdiction ........................ x

Statement of the Issues......................................................... 1

Statement of the Case .......................................................... 1

    I.    Course of Proceedings ............................................. 1

    II.    Statement of the Facts........................................... 2

        A.    The Motion to Dismiss the Indictment........................ 2

        B.    The Undercover Sting and Defense of Entrapment
            ............................................................... 4

        C.    Sentencing................................................ 12

    III.    Standards of Review ............................................ 16

Summary of the Arguments.................................................... 18

Arguments and Citations of Authority ...................................... 20

    I.    Title 26, Section 5861 is Unconstitutional ........................... 20

        A.    The Statute Exceeds Congress's Power to Tax and
            Violates the Tenth Amendment................................... 20

1. The Department of Justice Enforces the NFA Today.......................................................................25

2. The NFA Imposes Heavy Criminal Penalties on Violators.................................................................27

3. The NFA Neither Looks Like Nor Functions As a Revenue-Generating Measure............................29

4. The Supreme Court's Holding in *Sonzinsky* Was Limited...................................................................30

5. This Court Should Revisit *Spoerke*.........................32

6. The Criminal Penalties for Possessing an Unregistered Silencer Violate the Tenth Amendment............................................................33

B.    Even if the NFA is a Tax, the Tax Violates the Second Amendment and is Unconstitutional.............33

C.    The NFA, As Applied to Silencers, Violates the Second Amendment ....................................................35

1. The NFA's Criminal Prohibition on Possession of an Unregistered Silencer Imposes a Burden on Conduct Falling Within the Second Amendment............................................................37

2. The NFA's Criminal Prohibition on Possession of an Unregistered Silencer Does Not Survive the Appropriate Level of Scrutiny...........................41

II.   The District Court Erred in Denying Mr. Bolatete's Motions for Judgment of Acquittal Because the Evidence Was Insufficient to Overcome an Entrapment Defense...............41

III.  The 60-Month Sentence, Which Included an Upward Variance, Was Unreasonable................................................. 48

    A. The District Court Erred in Applying a Four-Level Enhancement Under USSG § 2K2.1(b)(6)(B) ................. 48

    B. The District Court Imposed a Substantively Unreasonable 60-Month Sentence that was Above the Guideline Range ............................................................. 53

Conclusion ........................................................................ 58

Certificate of Compliance with Type-Volume Limit.............................. 59

Certificate of Service ...................................................... 59

## TABLE OF AUTHORITIES

## Cases

*Bailey v. Drexel Furniture*, 259 U.S. 20 (1922) .......................................................... *passim*

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ...................................................... 34

*Bond v. United States*, 572 U.S. 844 (2014).............................................................. 21

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).............................................................. 21

*Cohens v. Virginia,* 6 Wheat. 264, 428, 5 L.Ed. 257 (1821)...................................... 21

*Cox v. New Hampshire*, 312 U.S. 569 (1941)......................................................... 33, 34

*Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767 (1994) .......................... *passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................................. *passim*

*Gall v. United States*, 552 U.S. 38 (2007)......................................................... 52, 53, 54

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ........................ 35

*Jacobson v. United States*, 503 U.S. 540 (1992)..................................................... 43, 44

*Kimbrough v. United States*, 552 U.S. 85 (2007)..................................................... 56

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) .................................................. 34

*Linder v. United States*, 268 U.S. 5 (1925).............................................................. 23

*Mathews v. United States*, 485 U.S. 58 (1988) ........................................................ 43

*McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819) .............................. 22

*McDonald v. Chicago*, 561 U.S. 742 (2010)............................................................. 34

*Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016)..................................... 52

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) .................................................. 33, 34

*Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012)............................... *passim*

*Peugh v. United States*, 569 U.S. 530 (2013) ........................................................ 52

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) ........................................ 52, 56

*Sherman v. United States*, 356 U.S. 369 (1958) ...................................................... 41, 43

*Silvester v. Becerra*, 138 S. Ct. 945 (2018) ............................................................ 36

*Sonzinsky v. United States*, 300 U.S. 506 (1937) ................................................ *passim*

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................ 21

*State v. Langlois*, 2 N.E. 3d 936, 957 (Ohio Ct. App. 2013) .................................... 39

*\*United States v. Brown*, 43 F.3d 618 (11th Cir. 1995) ...................................... *passim*

*\*United States v. Butler*, 297 U.S. 1 (1936) ............................................................ 22

*\*United States v. Constantine*, 296 U.S. 287 (1935) ............................................ 23, 25

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................................ 32, 40

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017) ........................................ 36

*United States v. Freed*, 401 U.S. 601 (1971) .......................................................... 21

*United States v. Gay*, 746 F. App'x 886 (11th Cir. 2018) ...................................... 51

*United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018) ............................ 52

*United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014) ........................................ 52, 54

*United States v. Hooper*, 566 F. App'x 771 (11th Cir. 2014) ................................ 54

*United States v. Irey*, 612 F.3d 1160 (2010) ............................................................ 53, 54, 56

*United States v. Isnadin*, 742 F.3d 1278 (11th Cir. 2014) .................................... 43, 45, 46

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .................................... 54

*United States v. Jimison*, 493 F.3d 1148 (9th Cir. 2007) ...................................... 50

*United States v. Kahriger*, 345 U.S. 22 (1953) ...................................................... 24

*United States v. Keene, 470 F.3d 1347 (11th Cir. 2006)...........................................52. 53

United States v. Livesay, 525 F.3d 1081 (11th Cir. 2008) ...............................................17

United States v. Lopez, 343 F. App'x 484 (11th Cir. 2009) .................................................54

United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011)........................................36

United States v. McCartney, 357 F. App'x 73 (9th Cir. 2009).........................................40

United States v. Miller, 307 U.S. 174 (1939) ..................................................................33

*United States v. Morrison, 529 U.S. 598 (2000)...........................................21, 22

United States v. Perez-Tosta, 36 F.3d 1552 (11th Cir. 1994). ........................................17

United States v. Plate, 839 F.3d 950 (11th Cir. 2016) .....................................................17

United States v. Rosales-Bruno, 789 F.3d 1249 (11th Cir. 2015) ...........................55, 56

United States v. Ross, 458 F.2d 1144 (5th Cir. 1972) ........................................................3

United States v. Rutgerson, 822 F.3d 1223 (11th Cir. 2016)........................................45

United States v. Ryan, 289 F.3d 1339 (11th Cir. 2002)...................................................42

United States v. Sistrunk, 622 F.3d 1328 (11th Cir. 2010) ......................................41, 42

United States v. Spoerke, 568 F.3d 1236 (11th Cir. 2009)...............................3, 4, 17, 32

United States v. Stepp-Zafft, 733 F. App'x 327 (8th Cir. 2018)....................................40

## Constitution

*U.S. Const. Amend. II.......................................................................................passim

*U.S. Const., Amend. X .....................................................................................passim

U.S. Const., Art. I, § 8, cl. 1 .....................................................................................22, 25

## Statutes and Guidelines

6 U.S.C. § 531 ............................................................................................................26

18 U.S.C. § 921 ........................................................................................... 1, 2

18 U.S.C. § 3231 ............................................................................................. viii

18 U.S.C. § 3553 ........................................................................................ 52, 57

18 U.S.C. § 3742 ............................................................................................. viii

26 U.S.C. § 5801 ............................................................................................... 20

26 U.S.C. § 5811 ..................................................................... 20, 28, 29, 31

26 U.S.C. § 5812 ............................................................................................... 28

26 U.S.C. § 5821 ..................................................................... 20, 29, 31

26 U.S.C. § 5841 ...................................................................... 1, 2, 20

26 U.S.C. § 5845 ............................................................................................... 20

26 U.S.C. § 5861 ............................................................................... *passim*

26 U.S.C. § 5871 ........................................................................................... 1, 2

26 U.S.C. § 7201 ............................................................................................... 27

26 U.S.C. § 7203 ............................................................................................... 27

26 U.S.C. § 7206 ............................................................................................... 27

26 U.S.C. § 7801 ............................................................................................... 26

28 U.S.C. § 1291 ............................................................................................. viii

Gun Control Act of 1968, 82 Stat. 1235 ................................................ 28

Pub. L. No. 107-296, §§ 1111, 1112(k), 116 Stat. 2135, (2002) ................ 26

USSG §1B1.3 ............................................................................... 48, 51

USSG §1B1.3 ............................................................................... 49, 50

USSG §2K2.1 ............................................................................... passim

## Other Authorities

A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense,* 97 Marq. L. Rev. 853 (2014) .............................................................. 38

ATF History Timeline, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/our-history/atf-history-timeline.................................... 26

Hearing Protection Act, H.R. 155, 116th Cong. (2019) ..................................... 37

S. Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017) ............................................................ 39

Silencers Helping Us Save Hearing Act of 2019 ("SHUSH" Act), S. 202, 116th Cong. (2019)…………………………………………………………………...37

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33 (2015-16)............................. 38, 39

Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?,* All Things Considered (NPR Mar. 21, 2017) ................................................ 39

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 Western Criminology Rev. 44 (2007).................................................................................................................... 40

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is a direct appeal in a criminal case from the final judgment of the United States District Court for the Middle District of Florida, Jacksonville Division, entered on September 17, 2018. Doc. 82 ("Judgment"). The district court had original jurisdiction pursuant to 18 U.S.C. § 3231.

Mr. Bolatete timely filed a notice of appeal on October 1, 2018. Doc. 84. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

x

## STATEMENT OF THE ISSUES

I.    Whether 28 U.S.C. § 5861 is unconstitutional.

II.    Whether the government presented sufficient evidence of predisposition to overcome the entrapment defense.

III.    Whether the 60-month, above-guideline sentence is unreasonable.

## STATEMENT OF THE CASE

### I.    COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW

The grand jury returned a one-count indictment against Mr. Bolatete alleging that on December 1, 2017, Mr. Bolatete knowingly possessed an unregistered silencer in violation of 26 U.S.C. §§ 5861(d) and 5871. Doc. 14. Mr. Bolatete moved to dismiss the indictment. Doc. 42. The court denied the motion. Doc. 54.

Mr. Bolatete proceeded to trial and advanced an entrapment defense. The jury found him guilty of Count One. Doc. 63 (Verdict Form). During the jury trial, Mr. Bolatete moved for a judgment of acquittal, which was denied. Doc. 91 at 60-61, 64. Over his objection, the district court added four levels to his offense level under the guidelines and

1

varied upward from the advisory guideline range. The district court
sentenced him to a 60-month term of imprisonment, followed by 24
months of supervised release. Doc. 82. Mr. Bolatete is incarcerated.

## II. STATEMENT OF THE FACTS

### A. THE MOTION TO DISMISS THE INDICTMENT

The grand jury returned a one-count indictment against Mr.
Bolatete. Count One alleged that on December 1, 2017, Mr. Bolatete

> knowingly received and possessed a device for silencing,
> muffling, and diminishing the report of a portable firearm as
> defined in 18 U.S.C. § 921(a)(24), specifically, a Knights
> Armament firearm silencer, not registered to the defendant in
> the National Firearms Registration and Transfer Record as
> required by 26 U.S.C. § 5841.

Doc. 14 at 1. Count One alleged a violation of 26 U.S.C. §§ 5861(d) and
5871. *Id.*

Mr. Bolatete moved to dismiss the indictment because 26 U.S.C. §§
5861(d) and 5871 are unconstitutional, facially and as applied to him.
Doc. 42. He asserted that the statute exceeded Congress's power to enact
legislation under the Taxation Clause. He also asserted that the
government's enforcement of criminal violations under its taxing
authority violated the Tenth Amendment's limitation on the federal
government's authority to invade the powers reserved to the States. Doc.

2

42. Mr. Bolatete acknowledged *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937), but argued that it was not controlling because its holding was limited to the constitutionality of a different part of the National Firearms Act, and his case was factually distinguishable. Doc. 42 at 6-7. He also acknowledged *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009), which noted that the Supreme Court in *Sonzinsky* had upheld the NFA based on Congress's power to tax. Doc. 42 at 7. He also argued that the NFA had lost any character as a taxing statute and had become a punitive statute, constituting an unlawful exercise of the police power in violation of the Tenth Amendment. *Id.* at 7-9. Mr. Bolatete requested oral argument. *Id.* at 9.

The government responded by arguing that *Spoerke* and *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972), were binding on the district court. Doc. 48 at 3. Mr. Bolatete replied. Doc. 51.

The district court did not hear argument, but orally denied the motion to dismiss on the first day of trial. Doc. 89 at 4. The district court later issued a written order denying the motion to dismiss. Doc. 54. The district court found that Mr. Bolatete's arguments were squarely foreclosed by *Spoerke*, which upheld the constitutionality of the statute

3

as applied to circumstances factually similar to those alleged in Bolatete's indictment. *Id.* at 2.

## B. THE UNDERCOVER STING AND DEFENSE OF ENTRAPMENT.

In the fall of 2017, a confidential source told local law enforcement that Mr. Bolatete had expressed animus toward Islam and members of that faith. The source also claimed that Mr. Bolatete might conduct an armed assault on a mosque in Jacksonville, Florida. The Jacksonville Sheriff's Office introduced an undercover detective, Raymond A. Goethe, ("UC") to Mr. Bolatete. The Federal Bureau of Investigation also became involved. *See* Doc. 73 (Presentence Report) ("PSR") ¶4; *see also* Doc. 89 at 145-47. The initial goal of the investigation was to determine whether Mr. Bolatete was serious in his reported threats to the mosque. Doc. 90 at 113.

The UC and another undercover law enforcement officer created a ruse to introduce the UC to Mr. Bolatete at his place of employment, Wacko's liquor store. On November 1, 2017, the other undercover officer pretended to be a Muslim customer. The UC struck up a conversation with Mr. Bolatete by disparaging the fake Muslim customer. Gov't Exs. 1A and 1B. The UC asked Mr. Bolatete for his name and then introduced

4

himself as "Drew." *Id.* The UC claimed he had just arrived in Jacksonville from Fort Myers for work and promised that he would be back to see Mr. Bolatete the next day. *Id.*

Over the month of November, the UC and Mr. Bolatete spent time together at a shooting range, where they discussed their interest in firearms, among other things. PSR ¶5. The UC also visited Mr. Bolatete at his place of employment, and they frequently texted each other.

During their conversations, Mr. Bolatete mentioned that his friend knew a way to convert semiautomatic weapons into fully automatic weapons, but that Mr. Bolatete and his friend did not want to do that because it was against the law. Doc. 89 at 198; Gov't Exs. 4A & 4B. The undercover detective also initiated conversations with Mr. Bolatete about obtaining explosives and using a bomb. Doc. 89 at 201; Gov't Exs. 4A & 4B. But Mr. Bolatete was not interested. *Id.*

The UC also created a fictional Muslim customer with whom he was arguing about a debt. The UC told Mr. Bolatete about the fictional Muslim customer and used him as an example of his dislike toward Muslims.

On November 14, 2017, while at the shooting range together, the UC and Mr. Bolatete talked about the availability of weapons, including silencers, in the Philippines.[1]  *See* Docs. 89 at 197-98; 90 at 131; Gov't Exs. 4A and 4B.  This was the first time that silencers were mentioned during their recorded conversations.  *See* Docs. 89 at 197-98; 90 at 131; Gov't Exs. 4A and 4B.  On November 20, 2017, Mr. Bolatete bragged to the UC that he once used a silencer to shoot a man in the stomach in the Philippines, although he had no intent to kill the man.  Gov't Exs. 5A & 5B.

Based on the two references to silencers, the UC decided to introduce a silencer to Mr. Bolatete to see what his reaction would be. Doc. 90 at 28.  On November 24, 2017, the UC drove Mr. Bolatete to the shooting range and showed up with a silencer, without telling Mr. Bolatete in advance that he was bringing a silencer.  *Id.* at 28, 32; PSR ¶6.  The UC did not mention the silencer during the car ride to the shooting range.  Doc. 90 at 33.  Mr. Bolatete first learned of the UC's possession of the silencer when they opened the trunk upon arriving at

---

[1] Mr. Bolatete and the UC used both the terms "silencer" and "suppressor" interchangeably.

6

the gun range. *Id.* The UC testified that he attached the silencer to the rifle, showed it to Mr. Bolatete, and told Mr. Bolatete that his buddy gave it to him to shoot while he was at the range.[2] *Id.* at 33, 34; PSR ¶6. The UC testified that Mr. Bolatete's responded, "oh, okay." Doc. 90 at 33. Both the UC and Mr. Bolatete shot the rifle on which the silencer had been mounted. *Id.* The undercover detective testified that the point of bringing the silencer was to see if Mr. Bolatete wanted to buy a silencer at the time. *Id.* at 28.

On the drive home from the range, the UC offered to sell the silencer to Mr. Bolatete. Doc. 90 at 35. Mr. Bolatete did not verbally respond affirmatively or negatively. *Id.*; Gov't Ex. 6A & 6B. However, he criticized the silencer for being very loud. Doc. 90 at 36; Gov't Ex. 6A & 6B. Mr. Bolatete and the UC discussed whether the asking price for the rifle was a good price. Mr. Bolatete stated that since they were not going hunting, there was no need for the suppressor. Doc. 90 at 38; Gov't Ex. 6A & 6B. Mr. Bolatete also stated that the police were very hot on suppressors. Doc. 90 at 38; Gov't Exs. 6A & 6B. Despite Mr. Bolatete's

---

[2] At trial, the government played a video of this encounter, but no transcript was prepared. *See* Doc. 90 at 33; Gov't Ex. 6A.

apparent disinterest in the silencer, the UC tried to get another conversation going about the silencer by talking generally about it. Doc. 90 at 39; Gov't Exs. 6A & 6B. But Mr. Bolatete still did not seem interested, responding only with "m-hum" or "yeah." Gov't Exs. 6A & 6B. Mr. Bolatete then told the UC about the special attachment for the rifle and how it varied from the silencer he had previously possessed for a .22 caliber. Gov't Exs. 6A & 6B. The UC offered to help Mr. Bolatete attack the mosque, but Mr. Bolatete rejected his offer. Doc. 90 at 42. The UC later returned to the idea of helping each other with the mosque attack and shooting the UC's fictional Muslim customer. Mr. Bolatete mentioned that the UC could use the silencer to shoot the customer, but not kill him, to let him know how valuable life is. Doc. 90 at 44-46. Mr. Bolatete discouraged the UC from harming the fictional Muslim customer. PSR ¶5.

They arrived at Mr. Bolatete's house and had a conversation outside of the car. Doc. 90 at 46; Gov't Ex. 6C & 6E. The UC suggested that Mr. Bolatete could use the suppressor at the mosque, but Mr. Bolatete dismissed the idea, responding that there would be no need for a suppressor there. Gov't Exs. 6C & 6E. Immediately thereafter, the UC

offered to trade Mr. Bolatete the suppressor, but Mr. Bolatete rejected his offer. *Id.* After more conversation, Mr. Bolatete unequivocally stated his bottom line: "I don't need the suppressor." Doc. 90 at 49; Gov't Exs. 6C & 6E.

The UC testified that at this point, he thought the entire operation was a failure. Doc. 90 at 49; *see also id.* at 52. He testified that Mr. Bolatete responded to the UC's offers to help and to trade the silencer by changing the subject or stating that he wasn't interested in the silencer. *Id.* at 50. The UC called his supervisor. *Id.* at 51; Gov't Exs. 6D & 6F. The UC told his supervisor:

> I found out he – he has no desire to own a silencer or anything like that, um,
>
> You know I men—mentioned selling it to him and even trading it to him for a .45 and he's like, you know "I have no desire."
>
> And I was like you could use it at the Mosque.
>
> He's like, "Nah, I won't need it there." He's like, "It won't matter whenever I do that."
>
> . . .
>
> So I'm gonna' have to just start finding shit that Muslims are doing on line and sending it to him I guess and show him how much I hate them and how they're killing people and it's time to do – to do stuff to them.

9

> That's really the only angle we have at this point since he says
> he doesn't need a silencer or a rifle or anything like that.

Gov't Exs. 6 & 6F.

The UC reinitiated contact with Mr. Bolatete by sending him a text message.  Doc. 90 at 55.  On November 26, 2017, Mr. Bolatete asked the UC over text how his negotiation of the rifle went with the UC's fictional friend.  *Id.* at 56.  The UC responded via text that the price would be 300 for the rifle or 400 for both the rifle and silencer.  *Id.* at 56.  He also texted that he had been looking into the license and that his friend was going to see if he could transfer it to the UC or if the UC would be required to go through the whole process.  *Id.*

On November 27, 2017, the UC texted Mr. Bolatete to tell him he planned to stop by Mr. Bolatete's place of employment later.  Doc. 90 at 57.  The UC visited Mr. Bolatete's workplace that evening.  *Id.*  During their conversation, the UC told Mr. Bolatete that he and his fictional friend were trying to figure out if they could transfer the silencer license without a fee.  Gov't Ex. 7B.  Mr. Bolatete advised the UC not to register the silencer because registration would allow the police to come into your house anytime without a warrant to inspect it.  *Id.*  Mr. Bolatete later

10

asked if the fictional friend had any additional silencers to sell.  *Id.*  The UC asked if Mr. Bolatete would be willing to buy a silencer, and Mr. Bolatete responded affirmatively.  *Id.*

Later that evening, the UC texted Mr. Bolatete and told him that the friend has more silencers and that the UC would try to get a good price for Mr. Bolatete.  Doc. 90 at 69; Gov't Ex. 2C.  The next day, on November 28, 2017, the UC texted Mr. Bolatete about the price for the silencer.  Doc. 90 at 70.  Mr. Bolatete texted that he was thinking of putting that on one of his firearms as needed.  *Id.* at 71.  He referenced it being unregistered and shorter to carry in a vehicle.  *Id.* at 72.  After an exchange of texts, they agreed to meet.  *Id.* at 76-85.  On December 1, 2017, the UC sold Mr. Bolatete a silencer.  Mr. Bolatete was then arrested for possessing an unregistered silencer.

In his post-arrest statement, Mr. Bolatete explained that he wanted to possess a silencer for hunting.  Gov't Ex. 11B at 16-18, 37.  He also explained that when the UC (whom he still knew as Drew) disparaged Muslims or talked about killing his customer, he tried "to ride with [Drew] on what his idea is or whatever."  *Id.* at 47.  He also "wanted to fish out who [Drew] really [was]" and texted him as part of "uncovering

who he really is." *Id.* He explained that he was worried that Drew might be a fugitive and wanted Drew to reveal himself, so he tried his best to portray to Drew that he would be ready to be an outlaw. *Id.* at 48.

## C.   SENTENCING

The presentence report reflected that Mr. Bolatete had absolutely no criminal history – no juvenile adjudications (PSR ¶23), no adult criminal convictions (PSR ¶24), no other criminal conduct (PSR ¶26), no pending charges (PSR ¶27), and no other arrests (PSR ¶28). Accordingly, Mr. Bolatete's total criminal history score was zero, which placed him in criminal history category I. PSR ¶25.

In the PSR, the probation office added four levels to Mr. Bolatete's offense level under USSG §2K2.1(b)(6)(B) for using or possessing any firearm in connection with another felony offense, or possessing or transferring any firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense. PSR ¶15. According to the PSR, "the silencer that Bolatete possessed had the potential of facilitating the shooting of the [undercover detective's] fictional customer, who[m] Bolatete offered to shoot." PSR ¶15. With this four-level enhancement, Mr. Bolatete's total offense level

was 22 and his guideline imprisonment range was 41 to 51 months. PSR ¶¶22, 61. Mr. Bolatete objected. PSR Addendum; Doc. 75 at 1-3; Doc. 92 at 7-9. The district court overruled his objection. Doc. 93 at 3-7; 9. Had the district court sustained Mr. Bolatete's objection, his offense level would have been 18, and his guideline imprisonment range would have been 27 to 33 months.

The PSR reported, among other details of Mr. Bolatete's life, that he was a 70-year-old man who had immigrated from the Philippines in 2009 and possessed a permanent resident (green) card. PSR ¶30. His wife, who was 72 years old, remained in the Philippines to care for their adult son, who suffers from cerebral palsy and requires 24-hour care. Mr. Bolatete hoped to earn enough money to later bring his wife and their disabled son to the United States. PSR ¶30. Mr. Bolatete enjoyed the support of his immediate and extended family in the United States PSR ¶¶40-41. Like Mr. Bolatete, all of his siblings are gun enthusiasts, which stemmed from the fact that they were raised by a police officer. PSR ¶41; *see also* Doc. 92 at 19-20. There was no indication, however, that Mr. Bolatete was violent or a threat. PSR ¶ 41; Doc. 92 at 20, 23. From September 2013 until his arrest on December 1, 2017, Mr. Bolatete

13

worked as a sales associate for Wacko's Liquor Depot. PSR ¶ 53. Prior to that, he worked as a housekeeping porter at a hotel. PSR ¶ 54. Mr. Bolatete has never used illicit substances, and although he formerly drank alcohol on a social basis, he stopped drinking approximately four years prior due to his declining health. PSR ¶49.

Mr. Bolatete underwent a radical nephrectomy to remove one of his kidneys in 1984. PSR ¶¶42, 45. He explained that physicians had found a growth on his right kidney and removed the kidney in an effort to preserve his well-being. PSR ¶45. In addition, medical records confirmed that Mr. Bolatete has historically suffered from diabetes, diabetic macular edema, rheumatoid arthritis, high cholesterol, and hypertension. PSR ¶43. He suffered two heart attacks in September 1997 and September 1999. Doc. 92 at 28. He was also treated for open wounds on his ankle (associated with diabetes), diabetic retinopathy, and cataracts in May 2018. PSR ¶44. In the fall of 2018, he suffered from hypoglycemia and was rushed to the hospital. Doc. 92 at 28.

The probation officer did not identify any factors that would warrant a departure or a variance from the advisory sentencing guideline range. PSR ¶¶ 74, 76. However, the government moved for an upward

departure or variance from the sentencing guidelines.  Doc. 72; PSR ¶¶75, 77; PSR Addendum.  The government asked the court to sentence Mr. Bolatete to 10 years' imprisonment.  Doc. 72 at 6.  Mr. Bolatete objected and argued against an upward departure or variance.  Doc. 75 at 3-5; Doc. 92 at 12-15.  Mr. Bolatete allocuted.  Doc. 92 at 24-29.

Mr. Bolatete moved for a downward variance or departure.  Doc. 75; Doc. 92 at 29-33.  He focused on Mr. Bolatete's complete lack of prior criminal record, his advanced age of 70, his poor health, his family circumstances, and the immigration consequences of his conviction.  *Id.*; *see also* Doc. 75 at 9-14. Mr. Bolatete advised that he was prepared to voluntarily agree to his removal to the Philippines without requesting a hearing or immigration proceeding. Doc. 92 at 34.  He also explained that in the Philippines, there is a term called "kwentong kanto."  Doc. 75 at 5. It's when men, particularly those of Mr. Bolatete's generation, get together and let off steam by fabricating fantastical and wildly hyperbolic stories about how they would deal with some perceived ill in the world. Each one tries to top the other in outrageousness.  No one believes, even for a minute, that the stories are true.  *Id.*  In sum, Mr. Bolatete's foolish and ill-thought out statements about committing acts of violence were all

just talk; there was insufficient evidence to prosecute Mr. Bolatete for anything but the possession of an unregistered silencer. *Id.* at 5-9; Doc. 92 at 32-33; *see also* Doc. 92 at 8-9, 13-15. Mr. Bolatete sought a sentence of time-served, which would have been approximately nine months imprisonment. Doc. 75 at 14.

The court sentenced Mr. Bolatete to 60 months' imprisonment. Doc. 93 at 11. This was higher than Mr. Bolatete's guideline range, after the four-level enhancement, of 41 to 51 months. The court stated that it would have imposed a 60 month sentence even if it had denied the four-level enhancement. Doc. 92 at 9-10. Mr. Bolatete objected to the sentence. Doc. 93 at 14, 15.

## III. STANDARDS OF REVIEW

When a motion to dismiss challenges the constitutionality of a statute, this Court reviews *de novo* the interpretation of the statute by the district court. *United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009).

This Court reviews *de novo* the denial of a defendant's properly preserved motion for judgment of acquittal. *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994).

16

"[E]ntrapment as a matter of law is a sufficiency of the evidence inquiry." *United States v. Brown*, 43 F.3d 618, 622 (11th Cir. 1995). The sufficiency of the evidence is reviewed *de novo*, viewing the facts and making all inferences in favor of the government. *Id.* "When an entrapment defense is rejected by the jury, [this Court's] review is limited to deciding whether the evidence was sufficient to permit a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." *Id.* The verdict must be overturned unless "any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt." *Id.*

This Court reviews the reasonableness of a sentence – whether procedural or substantive – for abuse of discretion. *United States v. Plate*, 839 F.3d 950, 956 (11th Cir. 2016); *United States v. Livesay*, 525 F.3d 1081, 1090-91 (11th Cir. 2008).

17

## SUMMARY OF THE ARGUMENTS

The National Firearms Act ("NFA") is unconstitutional. The NFA exceeds Congress's power to tax and is an unconstitutional exercise of a general police power in violation of federalism and the Tenth Amendment. The penalizing features of the statute are overwhelming, and it can no longer be viewed as a legitimate tax designed to raise revenue. The constitutional predicate for the NFA needs to be re-examined.

Even if the NFA were a proper exercise of Congress's taxing power, it impermissibly imposes a tax on the exercise of a constitutional right – the possession of firearm accessories – guaranteed by the Second Amendment. The Supreme Court has ruled consistently that governments may not so burden the enjoyment of rights granted under the Constitution. Because the NFA fee is not tied to and designed to defray the expenses of administering the Act, it is an unconstitutional tax on the exercise of a constitutional right. In addition, the NFA is unconstitutional because it burdens the right to bear arms under the Second Amendment and cannot withstand the appropriate level of scrutiny.

18

Moreover, the government did not carry its burden of proving predisposition to defeat Mr. Bolatete's entrapment defense. The government did not prove that prior to the contact with the government agent, he was predisposed to illegally possessing an unregistered silencer.

Additionally, the court erred by applying a four-level enhancement under USSG §2K2.1(b)(6)(B). The court also imposed a substantively unreasonable sentence and varied upward dramatically without sufficient justification.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## I.    TITLE 26, SECTION 5861(D) IS UNCONSTITUTIONAL.

Section 5861(d) makes it unlawful for any person to receive or possess certain firearms which are not registered to him in the National Firearms Registration and Transfer Record.  26 U.S.C. § 5861(d).  For purposes of the National Firearms Act, 26 U.S.C. § 5801, *et seq.*, ("NFA"), the term "firearm" includes a silencer.  *See* 26 U.S.C. § 5845(a).  The penalty for a violation of or failure to comply with § 5861(d) is found in § 5871, which provides for a fine of not more than $10,000 or imprisonment of not more than ten years, or both.  26 U.S.C. § 5871.  Here, Mr. Bolatete was sentenced to 60 months' imprisonment upon conviction for possessing an unregistered silencer.

Congress imposed the registration requirement on the maker or transferor of the qualifying firearm.  *See* 26 U.S.C. § 5841.  Congress also imposed a $200.00 tax for each firearm made or transferred and paid by the maker or transferor of the firearm.  *See* 26 U.S.C. §§ 5811, 5821.

### A. THE STATUTE EXCEEDS CONGRESS'S ENUMERATED POWER TO TAX AND VIOLATES THE TENTH AMENDMENT.

The Supreme Court has described the NFA as "a regulatory measure in the interest of public safety."  *United States v. Freed*, 401 U.S.

20

601 (1971); *see also Staples v. United States*, 511 U.S. 600, 627 (1994) (Stevens, J., dissenting) (the NFA "is primarily a regulatory measure").

As Justice Stevens explained:

> Congress fashioned a legislative scheme to regulate the commerce and possession of certain types of dangerous devices, including specific kinds of weapons, to protect the health and welfare of the citizenry. To enforce this scheme, Congress created criminal penalties for certain acts and omissions.

*Staples*, 511 U.S. at 630 (1994) (Stevens, J., dissenting).

Congress, however, does not enjoy a general police power and cannot punish felonies generally. *Bond v. United States*, 572 U.S. 844, 854 (2014) (quoting *Cohens v. Virginia,* 6 Wheat. 264, 428, 5 L.Ed. 257 (1821) ("For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally.'")). Rather, "[s]tates possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993). Indeed, punishment of local criminal activity is perhaps the clearest example of traditional state authority. *Bond*, 572 U.S. at 858 (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000)); *see also Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578 (2012) (punishment of street crime is an example of a general power of governing possessed by the States but not by the Federal

Government, often referred to as the "police power"). This concept of federalism is embodied in the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amend. X.

While the States have broad authority to enact legislation for the public good, the Federal Government has no such authority and "can exercise only the powers granted to it." *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819). As such, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *Morrison*, 529 U.S. at 607.

Congress has the enumerated power to lay and collect taxes. Article I, Section 8, Clause 1 of the Constitution. Using that power, Congress may levy taxes in an effort to influence conduct. *See Sebelius*, 132 S. Ct. at 2596. "The Federal Government may enact a tax on an activity that it cannot authorize, forbid, or otherwise control." *Id.* at 2579. But "Congress's ability to use its taxing power to influence conduct is not without limits." *Id.* at 2599; *see e.g., Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767 (1994); *United States v. Butler*, 297 U.S. 1 (1936);

*Bailey v. Drexel Furniture*, 259 U.S. 20 (1922). For example, Congress may not justify the regulation of the practice of the medical profession under the pretext of raising revenue. *See Linder v. United States*, 268 U.S. 5 (1925). And Congress may not usurp the police powers of the States under the guise of a taxing act. *See United States v. Constantine*, 296 U.S. 287 (1935). Indeed, courts must read the Constitution's grant of the power to tax "carefully to avoid creating a general federal authority akin to the police power."[3] *Sebelius*, 132 S. Ct. at 2578.

In *Sebelius*, the Supreme Court addressed the fine line between a tax and a penalty and observed that "[t]here comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment."[4]   *Id.* at 2599-2600 (internal quotations

---

[3] "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *Sebelius*, 132 S. Ct. at 2600. As such, the taxing power does not give Congress the same degree of control over individual behavior as the power to regulate commerce. *Id.*

[4] In *Drexel Furniture*, the Supreme Court asked:
> Does this law impose a tax with only that incidental restraint and regulation which a tax must inevitably involve? Or does it regulate by the use of the so-called tax as a penalty?

259 U.S. at 36.

23

omitted) (citing *Kurth Ranch*, 511 U.S. at 779, and *Drexel Furniture Co.*, 259 U.S. at 38). To determine whether an exaction is a tax or a penalty, the Supreme Court has repeatedly applied a "functional approach," focusing on "practical characteristics of the so-called tax." *Id.* at 2595. Applying a functional approach in *Sebelius*, the Supreme Court held that the shared responsibility payment required by the Patient Protection and Affordable Care Act of 2010 was a tax, not a penalty. The exaction imposed by the Affordable Care Act "look[ed] like a tax in many respects." *Id.* at 2594. Taxpayers paid the exaction into the Treasury when they filed their income tax returns, and the amount was determined by familiar factors such as taxable income, number of dependents, and joint filing status. *Id.* The requirement to pay was found in the Internal Revenue Code and enforced by the IRS. *Id.* The payment was expected to raise about $4 billion per year, satisfying the essential feature of a tax, which is producing revenue for the government. *Id.* (citing *United States v. Kahriger*, 345 U.S. 22, 28, n.4 (1953)). The exaction in *Sebelius* was not excessive, did not require scienter, and was collected "solely by the IRS through the normal means of taxation – except that the Service [was]

*not* allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution." *Id.* at 2596 (emphasis in original).

In contrast, the Supreme Court has determined that other exactions were not taxes but rather penalties after considering the proportionality of the burden imposed by the so-called tax to the infraction caused by the so-called tax, any requirement of scienter before imposing the so-called tax, and the responsibilities of the federal agency that enforces the so-called tax. *Id.* at 2595 (discussing the examples of *Drexel Furniture,* 259 U.S. at 36-37; *Kurth Ranch,* 511 U.S. at 780-82; *Constantine*, 296 U.S. at 295).

The NFA was enacted in 1934 based on Congress's power to lay and collect taxes. U.S. Const., Art. I, § 8, cl. 1 (granting Congress the power to "lay and collect Taxes, Duties, Imposts and Excises . . . ."). But employing a "functional approach" and looking at the "practical characteristics" of the NFA, the statute does not "look like" a tax in any respect.

## 1. THE DEPARTMENT OF JUSTICE ENFORCES THE NFA TODAY.

In November 2002, as part of the post-9/11 omnibus legislation enacted to strengthen national security and fight terrorism, Congress

created the Department of Homeland Security.   *See* Pub. L. No. 107-296,

§§ 1111, 1112(k), 116 Stat. 2135, (2002); *see also* 6 U.S.C. § 531.  For more

than 200 years, the ATF and its predecessor bureaus had functioned

within the Treasury Department, except for a brief period during the

Prohibition era, when the predecessor bureau resided within the

Department of Justice.  *See* ATF History Timeline, Bureau of Alcohol,

Tobacco, Firearms and Explosives, https://www.atf.gov/our-history/atf-

history-timeline.   As a result of the Homeland Security Act, ATF's

functions and responsibilities were transferred to the Department of

Justice in January 2003.   *Id.*   The Homeland Security act split the

missions and functions of ATF into two agencies:   the ATF and the

Alcohol and Tobacco Tax transferred to the Justice Department, and the

Trade Bureau ("TTB") remained with the Treasury Department.  *Id.*; *see*

*also* 26 U.S.C. § 7801(a)(2).

As such, the NFA is enforced by the Justice Department with

criminal penalties, not the Department of the Treasury or the Internal

Revenue Service ("IRS").  *Compare Sebelius*, 132 S. Ct. at 2594 (finding

that the payment was a tax in part because it was enforced by the IRS,

an agency responsible for collecting revenue) *with Drexel Furniture*, 259

U.S. at 36-37 (finding that the so-called tax was a penalty in part because it was enforced by the Department of Labor, an agency responsible for punishing violations of labor laws).  The transfer in 2002 of ATF from the Department of Treasury to the Department of Justice in the Homeland Security legislation reflects the importance of the criminal enforcement provision of the statute.  And unlike the tax in *Sebelius*, the ATF and DOJ may enforce the payments required by the NFA using "those means most suggestive of a punitive sanction, such as criminal prosecution." *Sebelius*, 132 S. Ct. at 2596.  Thus, as detailed below, the NFA imposes penalties, not mere taxes.

## 2. THE NFA IMPOSES HEAVY CRIMINAL PENALTIES ON VIOLATORS.

Failure to obtain a $200 tax stamp on a silencer carries a maximum penalty of $10,000 and 10 years' imprisonment.  26 U.S.C. § 5871.  In Mr. Bolatete's case, he is serving five years in federal prison for his fleeting possession of an unregistered silencer, purchased from an undercover detective.  This NFA criminal penalty is far more severe than other criminal penalties for failing to pay taxes.  For example, the maximum penalty for violations of the Internal Revenue Code is five years

imprisonment (26 U.S.C. § 7201), with other violations carrying three-year (26 U.S.C. § 7206) or one-year (26 U.S.C. § 7203) terms.

Moreover, the so-called tax imposed by the NFA on silencers has never increased from its original $200, set in 1934. Yet as part of the Gun Control Act of 1968, Congress dramatically increased the penalties set out in 26 U.S.C. § 5871 for failure to pay that $200 tax from $2,000 and five years' imprisonment to $10,000 and 10 years imprisonment. *See* Gun Control Act of 1968, 82 Stat. 1235. This further demonstrates that the criminal penalties – not any revenue generated from the so-called tax – are the driving force behind the NFA.

Moreover, the NFA criminalizes possessions by recipients of an unregistered firearm, who are not even required to pay the tax under 26 U.S.C. §§ 5811 and 5812. In other words, recipients of NFA firearms can be criminally prosecuted for possessing an unregistered firearm, but not for failing to pay the tax on such firearm. This further emphasizes the punitive and regulatory intent and function of the statute, distancing it from any relationship to the collection of taxes. Sections 5861(d) and 5871 of Title 26 are merely punitive and constitute an unlawful exercise of the police power in violation of the Tenth Amendment.

Today, the penalizing features of 26 U.S.C. §§ 5861 and 5871 overwhelm the NFA. To the extent the NFA may have originally been designed as a law of taxation, it has lost its character as a taxing statute and morphed into a law of regulation and punishment. *See Drexel Furniture*, 259 U.S. at 20; *see also Kurth Ranch*, 511 U.S. at 767. Currently, the driving force behind the NFA is the criminal enforcement of possessions of firearms, *see* 26 U.S.C. § 5861, not the collection of the $200 tax on transferring or making firearms. *See* 26 U.S.C. §§ 5811, 5821.

### 3. THE NFA NEITHER LOOKS LIKE NOR FUNCTIONS AS A REVENUE-RAISING MEASURE.

The $200 exaction the NFA imposes on transferors of silencers neither looks nor functions like a revenue-raising measure. *See Sebelius*, 132 S. Ct. at 2594-95 (applying a functional approach to determine that the shared responsibility payment was a tax). Unlike the exaction in *Sebelius*, the $200 transfer fee has no connection to income taxes. *See* 132 S. Ct. at 2594. It is not enforced by the IRS. It carries criminal penalties that are much more severe than the penalties imposed for failing to pay income taxes. The NFA's "prohibitory and regulatory effect and purpose are palpable." *Drexel Furniture*, 259 U.S. at 37.

29

In *Drexel Furniture*, the Court addressed the danger presented by allowing Congress to penalize under the guise of its taxing authority:

> Grant the validity of this law, and all that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the states have never parted with, and which are reserved to them by the Tenth Amendment, would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it. To give such magic to the word "tax" would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states.
>
> The difference between a tax and a penalty is sometimes difficult to define, and yet the consequences of the distinction in the required method of their collection often are important. Where the sovereign enacting the law has power to impose both tax and penalty, the difference between revenue production and mere regulation may be immaterial, but not so when one sovereign can impose a tax only, and the power of regulation rests in another.

*Id.* at 38.

### 4. THE SUPREME COURT'S HOLDING IN *SONZINSKY* WAS LIMITED.

Three years after the NFA was enacted, and 82 years ago, the Supreme Court upheld the part of the NFA that imposed a $200 annual

license tax on firearms dealers as a constitutional exercise of Congress's power to tax. *Sonzinsky v. United States,* 300 U.S. 506 (1937). But the Supreme Court's holding was "limited to the question of the constitutional validity of the statute in its application under the first count in the indictment[,]"which charged a violation of section 2 of the NFA imposing the special excise tax on dealers. *Id.* at 511. The Court held that the annual $200 tax on the firearms dealer operated as a tax and fell within Congress's taxing power. *Id.* at 514. But the Court found it "unnecessary to inquire whether the different tax levied by section 3 and the regulations pertaining to it are valid."[5] Section 3 of the NFA at that time imposed a tax, payable by the transferor, of $200 on each transfer of a firearm and was the precursor to §§ 5811, 5821.

The holding of *Sonzinsky* was limited to the constitutionality of a different NFA tax and regulation that are not present in Mr. Bolatete's case. Unlike *Sonzinsky*, Mr. Bolatete's case does not involve prosecution for failure to pay an annual licensing tax for dealers. Indeed, the Court in *Sonzinsky* specifically avoided ruling on the constitutionality of section

_____

[5] Section 3 at that time imposed a tax of $200 on each transfer of a firearm, payable by the transferor.

31

3, the precursor to the statute requiring registration of the silencer in Mr. Bolatete's case. In addition, unlike *Sonzinsky*, Mr. Bolatete is not being prosecuted for failing to pay a required tax; rather, the federal government is criminally prosecuting him for possessing a firearm for which someone else (the maker or transferor) was obligated to pay the tax.

Moreover, as described above, subsequent changes to the NFA have changed its character as a taxing statute and undermine *Sonzinsky*. To the extent this Court finds that *Sonzinsky* controls the issues presented herein, Mr. Bolatete raises the issues to preserve them for further review.

### 5. THIS COURT SHOULD REVISIT *SPOERKE*.

The district court denied Mr. Bolatete's motion to dismiss the indictment because his arguments were squarely foreclosed by *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009). *See* Doc. 54 at 2. In *Spoerke*, this Court held that the NFA was facially constitutional, summarily citing *Sonzinsky* for the proposition that the Supreme Court had upheld the NFA based on the taxation power of Congress. *Spoerke*,

32

568 F.3d at 1245.[6]  Recognizing *Spoerke*, Mr. Bolatete submits that this Court should revisit the precedent in light of his arguments herein.  He also raises the issues to preserve them for further review by the Supreme Court, as he submits that it is time for the Supreme Court to revisit *Sonzinsky*.

### 6. THE CRIMINAL PENALTIES FOR POSSESSING AN UNREGISTERED SILENCER VIOLATE THE TENTH AMENDMENT.

The criminal penalties for violating the NFA look like an exercise of general police power, not the enumerated power to tax.  As such, the NFA violates the Tenth Amendment and is unconstitutional.

### B. EVEN IF THE NFA IS A TAX, THE TAX VIOLATES THE SECOND AMENDMENT AND IS UNCONSTITUTIONAL.

Alternatively, if this Court rules that the NFA is constitutionally authorized as an exercise of Congress's taxing authority, "any tax must still comply with other requirements in the Constitution." *Sebelius*, 132 S. Ct. at 2598.  Mr. Bolatete urges this Court to apply the rule of *Cox v.*

---

[6] Other circuit courts have also upheld the NFA as constitutional under congressional power to tax. *See, e.g., United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018), *petition for certiorari docketed* (Jan. 18, 2019).

*New Hampshire* and *Murdock v. Pennsylvania* to Second Amendment rights and find that the NFA violates the Second Amendment.[7]

The government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943); *see also Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Under *Murdock* and *Cox*, seminal cases in the Supreme Court's "fee jurisprudence," the government may collect a fee to defray administrative and maintenance costs associated with the exercise of a constitutional (usually First Amendment) right, but it cannot impose a general revenue tax on the exercise of such a right. *See Murdock*, 319 U.S. at 113; *Cox*, 312 U.S. at 576-77.

Other circuits have appropriately imported these fee-jurisprudence principles to the Second Amendment analyses. *See, e.g., Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017); *Kwong v. Bloomberg*, 723

---

[7] Although the Supreme Court upheld the NFA tax against a Second Amendment challenge in *United States v. Miller*, 307 U.S. 174 (1939), that case did not challenge the NFA tax as a tax on the exercise of a constitutional right. Moreover, the Supreme Court later warned against giving too much weight to the *Miller* decision: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

34

F.3d 160, 165 (2d Cir. 2013).  The Second Amendment protects the right of the people to keep and bear arms, and it is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  *See McDonald v. Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion).

The NFA tax violates the *Murdoch* principle.  It is a general revenue-raising measure unrelated to the cost of administering the program targeted at an activity – manufacturing, buying, and selling arms and accessories – but rather is expressly designed to suppress exercise of the right to keep and bear arms protected by the Second Amendment.  As a tax, it is an unconstitutional tax on the exercise of a right protected by the Second Amendment.

## C. THE NFA, AS APPLIED TO SILENCERS, VIOLATES THE SECOND AMENDMENT.

The Second Amendment to the Constitution protects "the right of the people to keep and bear arms."  U.S. Const. Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court held that this provision "confer[s] an individual right to keep and bear arms," and that an outright ban on possessing useable handguns in the home violated the Second Amendment.

35

This Court employs a two-step inquiry when faced with Second Amendment challenges: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we ... apply the appropriate level of scrutiny." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) ("*GeorgiaCarry.Org I*"). "If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically understood, then the law comports with the Second Amendment. But if it does, then we must apply an appropriate form of means-end scrutiny." *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017), *cert. denied,* No. 18-6817, 2019 WL 113463 (U.S. Jan. 7, 2019).

The appropriate level of scrutiny for Mr. Bolatete's Second Amendment claim, which relates to the right of law-abiding citizens to possess protected firearms in the home, is strict scrutiny. *See, e.g., United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"); *see also Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from the denial of certiorari) ("Because the right

36

to keep and bear arms is enumerated in the Constitution, courts cannot subject laws that burden it to mere rational-basis review."); *Heller*, 554 U.S. at 628, n.27 (rejecting rational basis scrutiny).

### 1. THE NFA'S CRIMINAL PROHIBITION ON POSSESSION OF AN UNREGISTERED SILENCER IMPOSES A BURDEN ON CONDUCT FALLING WITHIN THE SCOPE OF THE SECOND AMENDMENT.

The NFA imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. By imposing tax and registration and authorization requirements on the making, possession, and transfer of silencers, the NFA undoubtedly imposes a burden on such conduct. Mr. Bolatete respectfully submits that silencers are protected by the Second Amendment.

Silencers are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Silencers serve a lawful health and safety purpose for law abiding citizens: they protect hearing.

Indeed, legislation currently pending in Congress seeks to protect citizens' hearing by removing silencers from the NFA. On January 3, 2019, the Hearing Protection Act, H.R. 155, 116th Cong. (2019), was introduced as a bill to amend the Internal Revenue Code of 1986 to remove silencers from the NFA definition of firearms. *See*

37

https://www.congress.gov/bill/116th-congress/house-bill/155/text. On January 24, 2019, the Silencers Helping Us Save Hearing Act of 2019 ("SHUSH" Act), S. 202, 116th Cong. (2019) was introduced as a bill to remove unnecessary federal regulations from silencers and make it easier for firearms users to protect themselves. *See* https://www.lee.senate.gov/public/index.cfm.2019/1/sen-lee-reintroduces-silencers-helping-us-save-hearing-act.

The hearing-protection benefits of silencers extend beyond mere hunting and sport-shooting. As some silencer advocates have pointed out, silencers improve accuracy by reducing muzzle flinch and the disorientation that can follow a loud shot. *See* A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense,* 97 Marq. L. Rev. 853, 892 n.221 (2014) (quoting firearms instructor's warning: "[I]f you fire that shotgun it's going to be extremely loud, and you will probably lose your hearing for a few minutes. Those few minutes can be vital, because the intruder now knows where you are and you're unable to be as alert as you normally would."); Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2015-16) ("Legitimate advantages

could also be listed for a suppressor, whether used for sporting purpose or for self-defense – reduction of noise, recoil, and muzzle rise immediately come to mind."). Silencers are thus valuable for home-defense – the "core lawful purpose" of firearms ownership recognized by *Heller*. 554 U.S. at 629-30. The person who reaches for a firearm to protect against an intruder does not want to pause and don earmuffs or earplugs to prevent the health and safety fallout of unsuppressed gunfire, and certainly does not want to muffle the sounds of the surrounding environment in order to protect his or her hearing.

While silencers aid in home defense, the use of silencers to commit crimes is exceedingly rare. S. Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017) (only .003 percent of silencers are used in crimes each year); Halbrook, 46 Cumb. L. Rev. at 63-67 ("use of silenced firearms in crime is a rare occurrence, and is a minor problem"); *State v. Langlois*, 2 N.E. 3d 936, 957 (Ohio Ct. App. 2013) ("the use of suppressors in gun crimes generally and in homicides specifically is extremely infrequent, and the criminal use of a registered suppressor is virtually nil relative to their widespread ownership"). According to one news source, "[d]ata from the ATF show

that silencers are seldom used in crime.  From 2012-15, 390 silencers were recovered from crime scenes where an ATF trace was requested. During that same period, more than 600,000 pistols were recovered." Nathan Rott, *Debate Over Silencers:  Hearing Protection or Public Safety Threat?,* All Things Considered (NPR Mar. 21, 2017).[8]  Another study of silencer-related prosecutions reported in Westlaw and Lexis from 1995 to 2005 found only 153 cases "in which the evidence suggests a silencer was used for a criminal purpose."  Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 Western Criminology Rev. 44, 49-51 (2007).[9]  More than 80% of those cases involved non-violent victimless crimes.  *Id.*  Only two reported federal cases in the 10-year study involved a silencer used in a murder.  *Id.*    In contrast, "ordinary firearms are far more likely to be actively employed, as well as used to injure a victim."  *Id.*

All of this evidence points to the conclusion that silencers are typically possessed by law-abiding citizens for lawful purposes, including health and safety protection.  *But see Cox*, 906 F.3d at 1170; *United States*

---

[8] Available at http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat.

[9] Available at http://www.westerncriminology.org/documents/WCR/vo8n2/clark.pdf.

*v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009). This Court should hold that silencers are protected by the Second Amendment.

### 2. THE NFA'S CRIMINAL PROHIBITION ON POSSESSION OF AN UNREGISTERED SILENCER DOES NOT SURVIVE THE APPROPRIATE LEVEL OF SCRUTINY.

As previously argued, Mr. Bolatete submits that the proper standard is strict scrutiny. Under strict scrutiny, the law must be narrowly tailored to advance a compelling government interest to survive. However, even if intermediate scrutiny is applied, the relevant provisions of the NFA, as applied to the possession of an unregistered silencer, cannot survive. As applied to silencers, the NFA violates the Second Amendment.

### II. THE DISTRICT COURT ERRED IN DENYING MR. BOLATETE'S MOTIONS FOR JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO OVERCOME HIS ENTRAPMENT DEFENSE.

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States*, 356 U.S. 369, 372 (1958).

An affirmative defense of entrapment requires two elements:  (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant. *United States v. Sistrunk*, 622 F.3d 1328, 1333 (11th Cir. 2010).  "In laying an evidentiary foundation for entrapment, the defendant bears the initial burden of production as to government inducement; once the defendant meets this burden, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002).  "Evidence of persuasion or mild coercion may be shown by the evidence that the defendant had not favorably received the government plan, and the government had to push it on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." *Sistrunk*, 622 F.3d at 1333 (quotations omitted).  After the defendant meets his burden to show "some evidence that the government induced the defendant to commit the crime, the question of entrapment becomes a factual one for the jury to decide." *Ryan*, 289 F.3d at 1344 (citation omitted).

Here, Mr. Bolatete sustained his burden of showing government inducement and the district court instructed the jury on entrapment.

42

Accordingly, the burden shifted to the government to prove beyond a reasonable doubt that Mr. Bolatete was predisposed to commit the crime. The government failed to meet its burden of proving Mr. Bolatete was predisposed to possess an unregistered silencer prior to contact by the undercover detective.

The predisposition element "focuses upon whether the defendant was an 'unwary innocent' or, instead an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (cited in *United States v. Isnadin*, 742 F.3d 1278 (11th Cir. 2014)). It also contemplates the temporal importance of predisposition. In *Jacobson v. United States*, 503 U.S. 540 (1992), the Supreme Court reversed the defendant's conviction because, "although [the defendant] had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was **independent and not the product of the attention that the Government had directed at [the defendant]** since January 1985." *Id.* at 550 (emphasis added); *see also Sherman*, 356 U.S. at 374.

43

This Circuit has also emphasized the temporal importance of the predisposition: "As *Jacobson* emphasized, predisposition has a definite temporal reference:   the inquiry must focus on a defendant's predisposition **before** contact with government officers or agents." *United States v. Brown*, 43 F.3d 618, 627 (11th Cir. 1995) (citing *Jacobson*, 503 U.S. at 549, n.2) (emphasis added).   "Where the Government has induced an individual to break the law and the defense of entrapment is at issue . . . the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act **prior to first being approached** by Government agents." *Jacobson*, 503 U.S. at 548-49 (emphasis added).

Moreover, as this Court has observed, the Supreme Court has long held the position that "predisposition requires a subjective inquiry focused on the defendant's state of mind prior to government inducement." *Brown*, 43 F.3d at 624 (citations omitted).  In *Brown*, this Court held that "the predisposition inquiry is a purely subjective one which asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's officers or agents." *Id.* at 618.   "Naturally, the more extensive and

44

involved the government's role, the more difficult it becomes to determine a defendant's independent readiness and willingness to commit a crime until, at some point, it becomes impossible to separate a defendant's independent readiness and willingness from the mental state created by the government." *Id.* at 624-25.

This Circuit has identified several principles to guide the fact-intensive examination of the sufficiency of the government's evidence of predisposition as a matter of law:

- The government need not produce evidence of predisposition prior to its investigation.

- Predisposition may be demonstrated simply by a defendant's ready commission of the charged crime.

- A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so.

- Post-crime statements will support a jury's rejection of an entrapment defense.

- Existence of prior related offenses is relevant, but not dispositive.

- Evidence of legal activity combined with evidence of certain non-criminal tendencies, standing alone, cannot support a conviction.

45

- The fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor.

*Id.* at 625 (citations and quotations omitted); *see also United States v. Rutgerson*, 822 F.3d 1223, 1235 (11th Cir. 2016); *Isnadin*, 742 F.3d at 1298. The key inquiry is whether the evidence in the light most favorable to the government shows that Mr. Bolatete was predisposed to commit the offense of conviction – possession of an unregistered silencer. *Isnadin*, 742 F.3d at 1302.

Here, Mr. Bolatete affirmatively told the UC that he was not interested in obtaining explosives or using a bomb. Doc. 89 at 201; Gov't Exs. 4A & 4B. He told the UC that he and his friend did not want to convert semiautomatic weapons into fully automatic weapons because it was against the law. Doc. 89 at 198; Gov't Exs. 4A & 4B. And in almost 70 years of living, Mr. Bolatete had absolutely no criminal history. PSR ¶¶23-28.

The UC introduced the idea of obtaining a silencer to see what Mr. Bolatete's reaction would be and to see if Mr. Bolatete wanted to buy a silencer at that time. Doc. 90 at 28. Without telling Mr. Bolatete that he was bringing a silencer, he showed up on one of their trips to the shooting

46

range with a silencer. *Id.* at 28, 32-33; PSR ¶6. Mr. Bolatete's immediate response was, "oh, okay," indicating disinterest. The UC offered to sell the silencer to Mr. Bolatete, but he did not respond (Doc. 90 at 35), criticized the silencer (*id.* at 36), stated there was no need for a silencer (*id.* at 38), and remarked that the police were hot on silencers (*id.* at 7); *see also* Gov't Ex. 6A & 6B; *supra* at 7-8. The UC tried again to interest Mr. Bolatete in the silencer without success. Doc. 90 at 39-42; Gov't Exs. 6A & 6B; *supra* at 7-8. The UC again revisited the suppressor, but Mr. Bolatete unequivocally rejected him, telling him "I don't need the suppressor." Doc. 90 at 46-49; Gov't Exs. 6C & 6E; *supra* at 8-9. Indeed, even the UC thought the entire operation was a failure and told his supervisor that Mr. Bolatete said he did not need a silencer or a rifle or anything like that. Gov't Exs. 6E & 6F; *supra* at 9-10. In sum, Mr. Bolatete was not ready and willing to engage in the charged crime absent any contact with the government's officers or agents. *See Brown*, 43 F.3d at 618.

Although Mr. Bolatete had claimed that he had previously possessed a silencer in the Philippines, there was no evidence to support his big talk and puffery. Moreover, there was no evidence that possession

47

of a suppressor was illegal in the Philippines.  While the evidence of Mr.

Bolatete's wild statements may indicate at best an interest in or

experience with silencers, it does not prove that Mr. Bolatete was

predisposed to commit the crime of possessing an unregistered silencer

prior to first being approached by the government agent.  *See Jacobson*,

503 U.S. at 548-49.  The district court erred by denying Mr. Bolatete's

motion for judgment of acquittal because the government did not meet

its burden of proving predisposition to defeat Mr. Bolatete's entrapment

defense.

### III.  THE 60-MONTH SENTENCE, WHICH INCLUDED AN UPWARD VARIANCE, WAS UNREASONABLE.

#### A. THE DISTRICT COURT ERRED BY APPLYING A FOUR-LEVEL ENHANCEMENT UNDER USSG §2K2.6(B)(6)(B).

The text of the guideline provides that if the defendant

> used or possessed any firearm or ammunition in
> connection with another felony offense; or
> possessed or transferred any firearm or
> ammunition with knowledge, intent, or reason to
> believe that it would be used or possessed in
> connection with another felony offense, increase by
> 4 levels.

USSG §2K2.1(b)(6)(B).  In determining whether subsection (b)(6)(B)

applies, "the court must consider the relationship between the instant

offense and the other offense, consistent with relevant conduct principles." USSG §2K2.1(b)(6)(B), comment. (n.14(E)). The application note specifically refers to the relevant conduct guideline, §1B1.3(a)(1)-(4) and its accompanying commentary. USSG §2K2.1(b)(6)(B), comment. (n.14(E)). In turn, the relevant conduct guideline provides that the specific offense characteristics shall be determined on the basis of

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivision[ ] (1)(A) . . . above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

> (4) any other information specified in the applicable guideline.

USSG §1B1.3(a).

The PSR assessed the four-level enhancement because the probation officer determined that the silencer "had the potential of facilitating the shooting of the [undercover detective's] fictional

49

customer, who[m] Bolatete offered to shoot." PSR ¶15. The court overruled Mr. Bolatete's objection, focusing on the definition of "in connection with" and concluding that the word "potential" casts a very wide net in a case. Doc. 93 at 6-7. The court also articulated the legal standard as putting "the burden of producing sufficient evidence that the Defendant intended to use or possessed the silencer in connection with a specific contemplated felony" on the Government. *Id.* at 5.

But another felony offense never occurred. Mr. Bolatete never shot, threatened to shoot, conspired to shoot, or made a plan to shoot the fictional Muslim customer. He could not have; he did not have sufficiently detailed information from the undercover detective about the fictional Muslim customer's alleged name, address, workplace, habits, or any other distinguishing or identifying characteristics. There were no substantial steps taken toward implementing this so-called plan. No evidence supports that Mr. Bolatete had formed a firm intent to use the silencer for a felonious purpose. *See United States v. Jimison*, 493 F.3d 1148, 1149 (9th Cir. 2007).

Moreover, the application note directs the court to consider the relationship between the instant offense and the other offense, consistent

with relevant conduct principles.  The talk about the fictional Muslim customer does not fit into the categories of §1B1.3(a).  The talk did not occur during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.  *See* USSG §1B1.3(a)(1).  The other definitions of relevant conduct do not apply.  As such, the conduct is not relevant under §1B1.3(a), and the enhancement in §2K2.1(b)(6)(B) does not apply.

Recently, this Court observed that whether §2K2.1(b)(6)(B) applies when "another felony offense" is only potential and had not actually occurred is a question of first impression in this Circuit and an important issue that this Court should address in a published opinion.  *See United States v. Gay*, 746 F. App'x 886, 887 (11th Cir. 2018).  In *Gay*, however, this Court declined to resolve the question because the district court stated that it would have imposed the same sentence had the four-level objection been sustained.  *Id.* at 887-88.  Here, immediately after citing *Gay*, the district court stated on the record that it would impose the same sentence "notwithstanding the granting of the probation officer's suggestion with respect to the question of the use of the weapon with

respect to the undercover police officer's fictitious Muslim character in the case."[10]  Doc. 93 at 9-10.  Nevertheless, this Court should not sidestep this important legal question of first impression in this Circuit.

"The district court has the ultimate responsibility to ensure that the Guidelines range it considers is correct, and the '[f]ailure to calculate the correct Guidelines range constitutes procedural error.'" *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (quoting *Peugh v. United States*, 569 U.S. 530, 537 (2013)); *see also Gall v. United States*, 552 U.S. 38, 51 (2007).  The Guidelines "are not only the starting point for most federal sentencing proceedings but also the lodestar." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).  Accordingly, this Court "needs an accurate Guidelines range because '[w]hen conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.'" *United States v. Hayes*, 762 F.3d 1300, 1325 (11th Cir. 2014)

---

[10] Mr. Bolatete recognizes that when a district judge clearly states that he would impose the same sentence regardless of whether he correctly applied the enhancement, the error in calculating the guidelines is harmless *if* the sentence imposed is reasonable.  *United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018) (quoting *United States v. Keene*, 470 F.3d 1347, 1349-50 (11th Cir. 2006)).  As argued *infra*, Mr. Bolatete submits that the sentence is not reasonable.

(Tjoflat, J., dissenting) (quoting *Gall*, 552 at 51) (emphasis omitted). This Court should determine whether the district court erred in enhancing the offense level by four levels.

### B. THE DISTRICT COURT IMPOSED A SUBSTANTIVELY UNREASONABLE 60-MONTH SENTENCE THAT WAS ABOVE THE ADVISORY GUIDELINE RANGE.

When a district court announces that it would have imposed the same sentence even if the guidelines were incorrectly calculated, this Court must still determine whether "the sentence imposed through the alternative or fallback reasoning of [18 U.S.C.] § 3553(a)" is reasonable. *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). As this Court explained:

> In determining whether it is reasonable [this Court] must assume that there was a guidelines error – that the guidelines issue should have been decided in the way the defendant argued and the advisory range reduced accordingly – and then ask whether the final sentence resulting from consideration of the § 3553(a) factors would still be reasonable. Otherwise, [this Court] will not know whether any error in deciding the guidelines issue, in arriving at the advisory guidelines sentence, was truly harmless.

*Id.* As such, when evaluating the substantive reasonableness of the sentence, this Court must assume that the guidelines issue was decided in Mr. Bolatete's favor and that the advisory guideline range was 27-33

months based on a total offense level of 18 and a criminal history category of I. *See id.* at 1349-50. The question becomes whether the 60-month sentence the court imposed is reasonable, assuming exactly the same conduct and other factors in the case, but using an advisory range of 27-33 months. *See id.* In that case, the Court varied upward by 27 months or 82% higher than the high end of the guideline range.

A major variance requires a more significant justification than a minor one. *Gall*, 552 U.S. at 47; *see also United States v. Irey*, 612 F.3d 1160, 1196 (2010) (en banc). The justification must be "sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50; *see also Irey*, 612 F.3d at 1196. This Court has vacated sentences as substantively unreasonable where the district court's justifications were insufficiently compelling to support the degree of a significant variance. *See e.g., Hayes*, 762 F.3d at 1307-08 (finding that the district court did not explain why various factors called for a downward variance to probation); *United States v. Hooper*, 566 F. App'x 771, 773 (11th Cir. 2014) (finding that the defendant's clean criminal history and family ties was insufficient to justify a "steep," 100% downward variance); *United States v. Lopez*, 343 F. App'x 484, 486 (11th Cir. 2009) (finding that the

defendant's criminal history alone was insufficient to justify an upward variance of almost 50 percent above the high end of the guideline range). Moreover, even where some variance is warranted by the circumstances, a district court abuses its discretion when the extent of the variance exceeds the justification for it. *See United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (finding that some variance was allowed but not to the extent given by the district court).

The district court abused its discretion and imposed a substantively unreasonable sentence when it significantly varied upward with a major variance and sentenced Mr. Bolatete to 60 months' imprisonment. This sentence was 27 months or 82% higher than the guideline range had the court sustained Mr. Bolatete's objection to the four-level guideline enhancement. And, it was 51 months higher than the nine-month (time-served) sentence requested as a downward variance by Mr. Bolatete. The court's justification was not sufficiently compelling to support the degree of the variance.

The district court also failed to afford consideration to relevant factors that were due significant weight. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). As Mr. Bolatete pointed out

55

in his motion for downward variance, Mr. Bolatete was a 70-year-old man with absolutely no criminal history. An elderly man, he also suffered from numerous health complications, including diabetes, one kidney, and cardiovascular issues, including previous heart attacks. He maintained stable employment and was legally in the United States with his green card. He did not drink or use drugs. He enjoyed the support of his immediate and extended family, and he volunteered to consent to removal to the Philippines to rejoin his wife and disabled adult son. He explained that many of his statements were just talk; there were no indications that he was violent or a true threat. Indeed, the UC could not gather evidence of any crime other than the sting which resulted in his possession of an unauthorized silencer.

Also, the district court considered an improper factor by allowing the guideline range to be incorrectly determined by the erroneous four-level enhancement, as described in above. *See supra*, III.A.; *see also Rosales-Bruno*, 789 F.3d at 1256. The court imposed a 27-month upward variance from where the guideline range would have been but for the enhancement, but it appeared to be only a nine-month upward variance because of the four-level enhancement that increased the high end by 18

months.  The error in applying the enhancement was an improper factor considered by the court.

In addition, the district court committed a clear error of judgment in considering the proper factors.  *See Rosales-Bruno*, 789 F.3d at 1256.  Despite the fact that the probation officer had not identified any factors that would warrant a departure or a variance from the advisory sentencing guideline range, PSR ¶¶ 74, 76, the government advocated for a sentence above the guidelines.  The district court overemphasized the necessity of deterrence and protecting the public given that Mr. Bolatete had agreed to voluntary removal to the Philippines and was 70 years old.

The district court imposed a sentence that was "greater than necessary" to achieve the overarching sentencing purposes of retribution, deterrence, incapacitation and rehabilitation.  *See Rosales-Mireles*, 138 S. Ct. at 1903.  This requirement that the sentence not be greater than necessary is the "overarching" command of the sentencing statute.  *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Irey*, 612 F.3d at 1197 (stating that the sentence must be one "that is not too short and not too long, but just right to serve the purposes of § 3553(a).").  In fashioning a sentence that meets the goals of sentencing, the district court must

57

consider a broad range of factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1)-(7). For the above reasons, Mr. Bolatete's sentence is substantively unreasonable and should be vacated.

## CONCLUSION

For the reasons above, this Court should reverse and vacate Mr. Bolatete's conviction and sentence.

Respectfully submitted,

*/s/ Lynn Palmer Bailey*
Lynn Palmer Bailey
Research and Writing Attorney
Florida Bar Number 0605751
200 West Forsyth Street, Suite 1240
Jacksonville, Florida 32202
Telephone 904-232-3039
E-mail: lynn_bailey@fd.org

58

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 11,743 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

/s/ Lynn Palmer Bailey
Lynn Palmer Bailey
Research and Writing Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March, 2019, the foregoing *Initial Brief of Appellant* was filed using the Court's Electronic Case Filing system, which will send notification to Germaine Seider, Assistant United States Attorney.

/s/ Lynn Palmer Bailey
Lynn Palmer Bailey
Research and Writing Attorney