No. 18-14184-EE

In the
# United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

BERNANDINO BOLATETE,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:17-CR-240-J-20JBT-1

## BRIEF OF THE UNITED STATES

MARIA CHAPA LOPEZ
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

PETER J. SHOLL
Assistant United States Attorney
Appellate Division
USA No. 082
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

June 7, 2019

*United States v. Bernandino Bolatete*
No. 18-14184-EE

**Certificate of Interested Persons
and Corporate Disclosure Statement**

In addition to the persons and entity identified in the Certificate of
Interested Persons and Corporate Disclosure Statement in Bernandino
Bolatete's principal brief, the following person has an interest in the outcome
of this case:

Sholl, Peter J., Assistant United States Attorney.

No publicly traded company or corporation has an interest in the
outcome of this appeal.

## Statement Regarding Oral Argument

The United States does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument .................................................. i

Table of Contents .......................................................................... ii

Table of Citations ......................................................................... iv

Statement of Jurisdiction ............................................................. viii

Statement of the Issues ................................................................. 1

Statement of the Case .................................................................... 1

    *Course of Proceedings* ............................................................. 2

    *Statement of the Facts* ............................................................ 3

    A.    The Evidence .................................................................. 3

        (1)    Background ............................................................. 3

        (2)    The Undercover Investigation ............................... 3

        (3)    The Searches of Bolatete's Car and Bedroom ................. 23

        (4)    Bolatete's Post-Arrest Interview ....................... 24

    B.    The Sentencing ........................................................... 26

    *Standard of Review* ............................................................. 31

Summary of the Argument ............................................................ 33

Argument and Citations of Authority ........................................... 35

    I.    The district court correctly determined that controlling

authority foreclosed Bolatete's arguments that
26 U.S.C. § 5861 is unconstitutional because it exceeds
Congress's power to tax and infringes on powers reserved
to the states by the Tenth Amendment........................................ 35

II.    The district court did not plainly err by failing to determine
sua sponte that 26 U.S.C. § 5861 is unconstitutional because
it imposes a tax on the exercise of a Second Amendment
right to possess silencers............................................................. 37

III.    The district court correctly denied Bolatete's motion for a
judgment of acquittal based on his entrapment defense .............. 39

IV.    The district court correctly applied the sentencing
enhancement for possessing the silencer in connection with
another felony offense and, in any event, any error would
have been harmless ..................................................................... 43

V.    The district court did not abuse its discretion by varying
upward and imposing a 60-month term of imprisonment ........... 48

Conclusion.................................................................................................. 54

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Gall v. U.S.*,
552 U.S. 38 (2007) ..................................................................... 32, 33, 50

*Rita v. U.S.*,
551 U.S. 338 (2007) ........................................................................49, 52

*Sonzinsky v. U.S.*,
300 U.S. 506 (1937) ........................................................................35–37

*U.S. v. Amedeo*,
487 F.3d 823 (11th Cir. 2007)..........................................................49, 53

*U.S. v. Boylen*,
511 F. App'x 950 (11th Cir. 2013) ....................................................45, 46

*U.S. v. Brown*,
43 F.3d 618 (11th Cir. 1995) ......................................................32, 39, 40

*U.S. v. Cox*,
906 F.3d 1170 (10th Cir. 2018), *petitions for cert. filed*,
Nos. 18-936 and 18-7451 (Jan. 14, 2019) ...........................................37, 38

*U.S. v. Gay*,
746 F. App'x 886 (11th Cir. 2018), *cert. denied*,
139 S. Ct. 1280 (2019)....................................................................45–47

*U.S. v. Gonzalez*,
550 F.3d 1319 (11th Cir. 2008) .............................................................. 52

*U.S. v. Hano*,
922 F.3d 1272 (11th Cir. 2019)............................................................. 32

*U.S. v. Hughes*,
840 F.3d 1368 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1354 (2017).......31, 32

*U.S. v. Irey*,
612 F.3d 1160 (11th Cir. 2010) (en banc)................................................ 53

iv

*U.S. v. Isnandin*,
   742 F.3d 1278 (11th Cir. 2014) ................................................................ 40

*\*U.S. v. Johnson*,
   441 F.2d 1134 (5th Cir. 1971) ................................................................. 38

*U.S. v. Johnson*,
   921 F.3d 991 (11th Cir. 2019), *petition for cert. filed*,
   No. 18-9399 (May 21, 2019) .................................................................... 36

*\*U.S. v. Keene*,
   470 F.3d 1347 (11th Cir. 2006) ............................................................46, 47

*\*U.S. v. Matthews*,
   438 F.2d 715 (5th Cir. 1971) .............................................................36, 37

*U.S. v. McBride*,
   511 F.3d 1293 (11th Cir. 2007) ................................................................ 53

*\*U.S. v. McCartney*,
   357 F. App'x 73 (9th Cir. 2009) ............................................................... 38

*U.S. v. Merrill,*
   513 F.3d 1293 (11th Cir. 2008) ................................................................ 32

*U.S. v. Osorio-Moreno*,
   814 F.3d 1282 (11th Cir. 2016) ............................................................48, 49

*\*U.S. v. Ross*,
   458 F.2d 1144 (5th Cir. 1972) .............................................................36, 37

*\*U.S. v. Sanchez*,
   586 F.3d 918 (11th Cir. 2009) .................................................................. 48

*\*U.S. v. Schultz*,
   565 F.3d 1353 (11th Cir. 2009) ...........................................................37–39

*\*U.S. v. Shaw*,
   560 F.3d 1230 (11th Cir. 2009) ...........................................................49, 50

*U.S. v. Smith*,
   719 F. App'x 998 (11th Cir. 2018) .......................................................... 32

*U.S. v. Spoerke*,
    568 F.3d 1236 (11th Cir. 2009) ...........................................................36, 37

*U.S. v. Stepp-Zafft*,
    733 F. App'x 327 (8th Cir.) *cert. denied*, 139 S. Ct. 279 (2018) .................... 38

*U.S. v. Tagg*,
    572 F.3d 1320 (11th Cir. 2009) ................................................................ 38

U.S. v. Talley,
    431 F.3d 784 (11th Cir. 2005), *abrogated on other grounds by*
    *Rita v. U.S.*, 551 U.S. 338 (2007) ................................................... 49, 52, 53

U.S. v. Vega-Castillo,
    540 F.3d 1235 (11th Cir. 2008) ................................................................ 36

U.S. v. Whitfield,
    50 F.3d 947 (11th Cir. 1995) ................................................................... 32

U.S. v. Williams,
    431 F.3d 767 (11th Cir. 2005) .................................................................. 47

*U.S. v. Williams*,
    446 F.2d 486 (5th Cir. 1971) ................................................................... 38

*U.S. v. Wright*,
    117 F.3d 1265 (11th Cir. 1997), *modified on rehearing on other grounds*,
    133 F.3d 1412 (11th Cir. 1998) ................................................................ 38

**Statutes**

18 U.S.C. § 921(a)(3) .................................................................................. 44

18 U.S.C. § 3231 ...................................................................................... viii

*18 U.S.C. § 3553(a) ............................................................................. *passim*

18 U.S.C. § 3553(a)(1) ................................................................................ 51

18 U.S.C. § 3553(a)(2)(A)–(C) ..................................................................... 51

18 U.S.C. § 3742(a) .................................................................................. viii

26 U.S.C. § 5801 et seq .................................................................. 2

26 U.S.C. § 5861 ................................................................... *passim*

26 U.S.C. § 5861(d) .................................................... 2, 33, 38, 52

26 U.S.C. § 5871 ............................................................................ 52

28 U.S.C. § 1291 ......................................................................... viii

**Rules**

Fed. R. App. P. 4(b) ................................................................... viii

**Other Authorities**

U.S. Const., Art. I, § 8, cl. 1 ....................................................... 35

USSG §1B1.3(a)(1)(A) .................................................................. 46

*USSG §2K2.1(b)(6)(B) ....................................................... *passim*

USSG §2K2.1, comment. (n.1) ..................................................... 44

*USSG §2K2.1, comment. (n.14(A)) ....................................... 44–46

USSG §2K2.1, comment. (n.14(E)) .............................................. 44

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered the judgment against Bernandino Bolatete on September 17, 2018, D82,[1] and Bolatete timely filed a notice of appeal on October 1, 2018, D84. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal, *see* 28 U.S.C. § 1291, and authority to examine Bolatete's challenges to his sentence, *see* 18 U.S.C. § 3742(a).

---

[1] "D" refers to the district court's docket.

## Statement of the Issues

I.  Did the district court correctly determine that controlling authority foreclosed Bolatete's arguments that 26 U.S.C. § 5861 is unconstitutional because it exceeds Congress's power to tax and infringes on powers reserved to the states by the Tenth Amendment?

II.  Did the district court plainly err by failing to determine sua sponte that 26 U.S.C. § 5861 is unconstitutional because it imposes a tax on the exercise of a Second Amendment right to possess silencers?

III.  Did the district court correctly deny Bolatete's motion for a judgment of acquittal based on his entrapment defense?

IV.  Did the district court correctly apply the sentencing enhancement for possessing the silencer in connection with another felony offense, and would any error have been harmless?

V.  Did the district court abuse its discretion by varying upward and imposing a 60-month term of imprisonment?

## Statement of the Case

A jury found Bolatete guilty of having received and possessed an unregistered firearm silencer. The district court varied upward and imposed a 60-month term of imprisonment. Bolatete challenges the denials of his motion to dismiss the indictment on the ground that the statute of conviction is

1

unconstitutional and his motion for a judgment of acquittal based on his entrapment offense. He also challenges his sentence.

## Course of Proceedings

The indictment charged Bolatete with having received and possessed an unregistered firearm silencer, in violation of 26 U.S.C. § 5861(d). D14. Bolatete moved to dismiss the indictment, arguing that section 5861 is unconstitutional, facially and as applied to him, because in enacting the National Firearms Act, 26 U.S.C. § 5801 et seq. ("NFA"), Congress exceeded its power to impose taxes and infringed on powers reserved to the states by the Tenth Amendment. D42. The district court denied that motion because controlling authority foreclosed those claims. D54; D89 at 4.

Bolatete went to trial, D55; D56; D59, and presented an entrapment defense, D89 at 140–41; D91 at 88–103. At the end of the United States' case, D57; D91 at 59–63, and at the close of the evidence, D58; D91 at 64, the district court denied his motions for a judgment of acquittal based on the entrapment defense. The court instructed the jury on that defense, D91 at 119–20, and the jury found him guilty, D63; D91 at 129–131. The court then varied upward from the United States Sentencing Guidelines range of 41 to 51 months in prison and imposed a 60-month term of imprisonment. D81–D83.

This appeal followed. D84.

2

*Statement of the Facts*

**A.    The Evidence**

*(1)    Background*

Sometime before November 2017, a confidential source told the Jacksonville Sheriff's Office that Bolatete had threatened to attack a local mosque. D89 at 142, 144–48; D90 at 148. According to the source, Bolatete had a kidney condition, and he planned to attack the mosque when he had to start receiving dialysis. D89 at 146.

The sheriff's office initiated an undercover operation in which two detectives would pretend to be customers at the liquor store where Bolatete worked. D89 at 147. One detective, who spoke Arabic, would portray a rude customer from the Middle East. *Id.* When he left, the lead detective would address Bolatete and complain about people from the Middle East. *Id.* at 147–48. The goals the investigation were to gain Bolatete's trust, assess the threat, and prevent the attack. D89 at 147–48; D90 at 113, 148–50, 156–59.

*(2)    The Undercover Investigation*

On November 1, 2017, the two undercover detectives entered the liquor store separately. D89 at 152, 156–57; D90 at 114–15. The rude detective talked loudly in Arabic on his cellphone and ignored Bolatete's inquiries. D89 at 156. As Bolatete retrieved some liquor for the rude detective, the lead detective

yelled, "Hey man, can you pay attention?" *Id.* The rude detective ended his call, bought the liquor, and left. *Id.* at 156–57.

After the rude detective left, the lead detective asked for a pint of vodka and said, "These motherfuckers man, I'm so tired of them." D89 at 157; GX1B at 1.[2] Bolatete responded, "Yeah, yeah." GX1B at 1. As they finished the transaction, the detective said, "It's so old. They think they own shit," and Bolatete complained about the rude detective. *Id.* The detective then said, "Just tired of this shit. They … kill us and kill us and kill us and, you know, we're the ones that are bad. Like in New York." *Id.* at 2. Bolatete again said, "Yeah, yeah." *Id.* The detective continued, "That shit in New York. You know, nobody does anything to them. They walk around like … you know what I'm sayin'?" *Id.* Bolatete agreed, explaining that he had come from a part of the Philippines where he had had "very bad experience with Muslims," where "you really hate Muslims," and where Muslims "call you [an] infidel" and "want to kill you" if you are a non-Muslim. *Id.* Bolatete also stated, "That's why … I think [the rude detective] is one, you know, just like attitudes of inconsiderate people." *Id.* at 3. As the lead detective left, he introduced himself and said he had just moved to Jacksonville. *Id.*

─────────────────

[2] "GX" refers to the United States' trial exhibits.

Five days later, the lead detective returned to the liquor store. D89 at 159, 162. The purpose of the visit was to continue to gain Bolatete's trust, discuss guns, obtain intelligence about the potential attack, and possibly receive an invitation to accompany Bolatete to his shooting range. *Id.* at 159–60. (The preliminary investigation had revealed that Bolatete attended a local shooting range. Doc. 89 at 145–46.) The detective said he recently had retrieved his guns and needed to find a place to go shooting. GX2B at 2, 5. Bolatete said, "Oh-oh that's good," and inquired whether the detective knew about a recent mass shooting at a church in Texas. D89 at 163; GX2B at 2. The detective said the Texas incident was "crazy." GX2B at 3. Bolatete responded, "That's why, I always have my… AR with me at the car, … [Y]ou don't know, what's going to happen next, you know?" *Id.* The detective replied, "Yeah, surprised it wasn't a Muslim." *Id.* Bolatete then laughed and brought up the rude detective. *Id.*

As the conversation continued, Bolatete and the detective discussed their firearms and Bolatete's shooting range. GX2B at 3–7. Bolatete showed the detective his Glock pistol and said he could "hit a headshot" with it at 25 yards. D90 at 164; GX2B at 5 (quote). (He kept the pistol nearby while he was at work. D90 at 164.) He also stated that he had lots of pistols, that he carries a Beretta in his pocket, that he keeps an "AR" and a ".45" in his car, and that he

5

had lost a kidney when a drunk police officer had shot him in the Philippines. GX2B at 5–7. Finally, he gave the detective his cellphone number and agreed to take the detective shooting. D89 at 165; D90 at 117–18; GX2B at 5–6.

Over the next several weeks, Bolatete and the detective exchanged text messages. D89 at 165–66; GX2C. (In the transcript, Bolatete's texts are indented. D89 at 166–67.) In an early exchange, Bolatete said that a drunk customer had pulled a gun on the manager of a club next door, that the club is "really crazy," and that "that's why [he's] always prepared for it." GX2C at 1. They also discussed a possible shooting trip. *Id.* at 2. (The detective wanted to go shooting with Bolatete to gain his trust and assess whether he could conduct the attack. D89 at 171.)

On November 8, the detective visited the liquor store to maintain contact with Bolatete and discuss the shooting trip. D89 at 168–69. He bought more liquor, discussed the trip, and left. *Id.*

The next day, Bolatete agreed to take the detective and "Nerio," one of his "shooting buddies," to his shooting range the following day. GX2C at 3.

On November 10, the detective picked up Bolatete and drove to Nerio's house. D89 at 171. On the way, they passed a mosque. *Id.* at 183–85; GX3B at 1; GX3C. When the detective mentioned the mosque, Bolatete said he "plann[ed] to stay" at the mosque when it became necessary for him to start

6

receiving dialysis. GX3B at 1–2. The detective responded, "So what are you going to do whenever you find that out?" *Id.* at 2. Bolatete laughed and said he would "bring [his] long guns" there, "stay at [the mosque's] tower," and "[k]eep shooting those Muslims … on Friday," the Muslim day of worship. *Id.* He also said, "[W]e've got quite a lot of problems and … Muslims" in the Philippines. *Id.*

The detective asked Bolatete whether he would attack the mosque alone. GX3B at 2. Bolatete responded, "I'll do that, uh, the doctor would say that I have to undergo dialysis so … oh well. Not much to say." *Id.* at 2–3. The detective inquired when Bolatete would need to start dialysis. *Id.* at 3. Bolatete said it would be soon and that his next medical appointment was on December 6. *Id.* He also laughed and said he would "try a Christian doing uh, terroristic … act this time … to the Muslims" instead of the Muslims "doing it all the time." *Id.* When the detective inquired whether Bolatete would "just … climb up in the tower," Bolatete laughed and said it would be "great" to "go up to the tower and start shooting." *Id.* at 4. He also confirmed that he had visited the mosque and inspected the tower, *id.*, and said he had five rifles, including an "AR-15" that can be converted to an "AR-47 *[sic]*," *id.* at 5.

The detective brought up Muslims in the Philippines again. D89 at 187. Bolatete said that they are "crazy," that their religion is a "way of life," that

7

"it's always their way," and that "it's always … them attacking us." GX3B at

6. He also reiterated that Muslims believe non-Muslims should be killed. *Id.* at

7.

After the detective and Bolatete picked up Nerio, they drove to the

shooting range. D89 at 188. They fired their guns and discussed various topics,

but they did not discuss Muslims or the mosque. *Id.* They then returned to

Nerio's house, where they ate lunch and cleaned their guns. *Id.* at 189.

While they were eating, the detective told Bolatete that a friend with a

gambling problem was trying to sell his firearms at discounted prices. D89 at

190; D90 at 123–24. He introduced this story to gain Bolatete's trust, show

they had common interests, make Bolatete think he had access to various

firearms, and determine whether Bolatete was serious about his plan. D89 at

190–91; D90 at 124–25. He did not offer to broker a deal. D89 at 191.

Around this time, the FBI joined the investigation. D91 at 6, 47.

On November 14,  Bolatete, Nerio, and the detective went to the

shooting range again. D89 at 192–94, 198–99. The detective's goal for this trip

was to gain Bolatete's trust, show him they had the same opinions about

people from the Middle East, and obtain information about the mosque attack.

*Id.* at 193–94, 199–201; D90 at 127–29. While they were riding in the car, the

detective said he had encountered a problem with a Muslim customer at work.

GX4B at 1. Bolatete responded, "Ughhh." *Id.* The detective explained that the (fictional) Muslim had refused to pay for a rewiring job. *Id.* Bolatete responded, "Umhm." *Id.* The detective continued, "So, I'm starting to see why you don't like them." *Id.* at 2. Bolatete then reiterated that religion is a "way of life" for Muslims and that Muslims "want to be in control" and will "abuse you" if they can. *Id.*

Bolatete and the detective also talked about the availability of weapons in the Philippines. D89 at 196–97. Bolatete volunteered, "You can even … get suppressors there." GX4B at 3. (This was the first time anyone mentioned suppressors or silencers.[3] D90 at 131.)

As they passed the mosque, the detective stated, "There's your favorite place." GX4B at 4; *see* D89 at 199. Bolatete laughed and said, "Oh, yeah." GX4B at 4. When the detective asked Bolatete why he planned to attack the mosque with guns instead of a bomb, Bolatete stated, "It depends on the situation" *Id.* But he expressed no interest in explosives, and the detective did not offer to obtain explosives for him. D89 at 201. Instead, Bolatete explained that he wanted to "give these freaking people a taste of their own medicine,"

---

[3]A "suppressor" is essentially a "silencer." D89 at 198; D90 at 197–98. The detective and Bolatete used both terms. In this brief, the United States uses the term "silencer."

that it would be hard to procure a bomb without getting caught, and that he was not worried about getting caught while attacking the mosque with his firearms because he would be committing "suicide by cop." GX4B at 4–5. Later, the detective stated, "[T]hey're usually the ones that do all the evil and nobody ever does evil to them." *Id.* at 6.

Eventually, the detective picked up Nerio. D89 at 201–202. They went to the shooting range and fired their guns, but they did not discuss the mosque, silencers, or explosives that day. *Id.* at 202–03.

Over the next few days, Bolatete and the detective exchanged text messages regarding various topics (including ammunition and magazines, the detective's friend with the gambling problem, and the detective's difficult Muslim customer) and arranged another shooting trip. D89 at 204–07; GX2C at 4–11. Regarding the difficult Muslim customer, the detective explained that the customer had refused to let him retrieve a tool from his property. GX2C at 6. Bolatete responded, "That's commonly how they are buddy, that's why I want to shoot those freaking idiots." *Id.* at 7. Later, the detective said Muslims "treat us like shit," acknowledged he was starting to understand that "Muslims take advantage of everyone," and offered to help Bolatete shoot Muslims. *Id.* at 6–7.

On November 20, the detective visited Bolatete at the liquor store. D89

10

at 207–08; GX5B. His goals were to maintain contact with Bolatete, discuss his friend who was selling his firearms and his difficult Muslim customer, and arrange another shooting trip. D89 at 208–09; D90 at 12–13, 157–59.

When Bolatete asked the detective about his day, the detective said he had been dealing with the difficult Muslim customer. GX5B at 2. Bolatete said, "[I]t's a problem," and, "But for us, also, that, uh, only thing to do is, uh, shoot him somewhere." *Id.*

The detective also asked Bolatete about his day. GX5B at 3. Bolatete stated, "You know I … had one [non-Muslim] asshole like that in … the Philippines. Shot him [in the stomach] with a 22 with a silencer." *Id.* at 3–4. (This was the second time anyone mentioned silencers or suppressors.) Bolatete explained that the victim had survived, but, after the shooting, the victim had "really go[ne] straight." GX5B at 4.

When the detective explained that his difficult Muslim customer was "rubbing it in our face," Bolatete said that the detective and his employer should "study [the customer's] movements" and "hit him" away from his house. GX5B at 4. The detective understood Bolatete to be suggesting that he and his employer kill the customer. D90 at 15–16. Bolatete also said that if they "hit" the customer in a rough neighborhood and made it look like a robbery, the investigation probably would not focus on them. D90 at 15–16;

11

GX5B at 4–5 (quotation).

The detective and Bolatete also discussed their shooting trip and the firearms and ammunition they would bring. GX5B at 5–12. The detective said his friend with the gambling problem had lent him two rifles. GX5B at 6, 12–13. When the detective asked Bolatete whether he needed any new firearms, Bolatete asked what type of rifles they were. GX5B at 6. The detective said he would send pictures to Bolatete. *Id.* Bolatete also confirmed that the next medical appointment for his kidney condition was on December 6. *Id.* at 7. (The detective asked about the appointment to determine whether the mosque attack might be imminent. D90 at 17–18.)

Near the end of the visit, the detective offered to help Bolatete attack the mosque. D90 at 21; GX5B at 13. Bolatete responded, "Hmm. Yeah," and "Let's see what happens." *Id.* When the detective repeated the offer, Bolatete replied, "Yeah." *Id.* (The detective made this offer to see what Bolatete had done to plan the attack. D90 at 21.)

Two days later, the detective sent Bolatete a photo of the rifle he planned to bring to the shooting range, explaining that his friend had said it was one of his older rifles and that he would sell it for a good price. D90 at 22–23; GX2C at 10; GX2E. Over the next couple of days, they exchanged texts about their next shooting trip and discussed the firearms and ammunition they would

bring. GX2C at 10–11. Bolatete asked the detective to bring his friend's rifle, and the detective said he wanted Bolatete's opinion about it. *Id.* at 11.

On November 24, Bolatete and the detective went to the shooting range. D89 at 207; D90 at 24–25, 27–28; GX2C at 11. In light of Bolatete's statements that he had owned a silencer and had used it when he shot someone in the Philippines, the detective brought a silencer to see how Bolatete would react, show that his friend had access to firearms and silencers, and find out whether Bolatete wanted to buy a silencer. D90 at 28, 133–35. The detective did not tell Bolatete about the silencer, and Bolatete did not ask him to bring one. *Id.* at 32–33, 133.

The detective picked up Bolatete. D90 at 28. While they were driving, Bolatete asked the detective whether he had brought his friend's rifle and how much his friend wanted for it. *Id.* at 29; GX6B at 1. The detective said that he had the rifle and that his friend wanted $300 or $400. GX6B at 1. The detective did not mention the silencer. D90 at 32–33.

As the conversation continued, the detective discussed the difficult Muslim customer. GX6B at 3. Bolatete said, "That guy's really crazy huh." *Id.* The detective continued, "Man … we need to go and do a hit on him, take him out." *Id.* (The detective made this statement to gain Bolatete's trust and show that he remembered Bolatete's suggestion about shooting the Muslim

customer. D90 at 29–30.) Bolatete responded, "Yeah," GX6B at 3, but he did not show much of a reaction, D90 at 30.

When they arrived at the range, the detective opened the trunk and displayed the rifle with the silencer on it. D90 at 33–34. The detective explained that his friend had lent him the silencer also. *Id.* This was the first time Bolatete learned about the silencer. *Id.* at 33, 134. Bolatete reacted as though it was not unusual. *Id.* at 34. They then entered the range and tested the rifle and silencer. *Id.*

As they drove back to Bolatete's house, Bolatete told the detective that $300 would be a good price for the rifle, especially if it included the silencer. GX6B at 4. The detective agreed and offered to sell the silencer to Bolatete. D90 at 35, 135; GX6B at 4. Bolatete complained that it was much louder than the one he had owned in the Philippines, D90 at 36, 135–36; GX6B at 4–5, and "didn't show a lot of interest in it." D90 at 35–36, 135–36. But he nodded as if he would buy it if it were available. *Id.* at 35–36.

At this point, Bolatete called Nerio on his cellphone and spoke in a language the detective did not understand. D90 at 36–37. After the call, Bolatete said Nerio thought $300 would be a "giveaway price" for the rifle. GX6B at 6. Bolatete also said the price would be even better if it included the silencer. *Id.* But he cautioned that "there's no need" for a silencer because

14

"we're not going hunting" and the police are "very hot" on silencers. *Id.*

As they continued driving, Bolatete's demeanor was different, and the conversation lagged. D90 at 38–39. When the detective mentioned the silencer, they discussed the possibility that the detective might sell it or trade it for other firearms or accessories, the silencer that Bolatete previously had owned, and the technical aspects of silencers. *Id.* at 39; GX6B at 7–8. Bolatete exhibited a good working knowledge of silencers. D90 at 39–40.

As they passed the mosque, the detective offered to help Bolatete attack it. D90 at 40, 137; GX6B at 9. Bolatete laughed, said that the detective and Nerio were the only people who knew about his plan, and explained that his plan was "wishful thinking" to "make use of those last moments" if his kidney condition deteriorated. GX6B at 9. When the detective repeated his offer, Bolatete said it would "depend[] on the situation." *Id.* But Bolatete ultimately rejected the offer because the detective was young, healthy, and had a child. D90 at 42; GX6B at 9–10.

They also discussed Bolatete's family in the Philippines. D90 at 42. Bolatete said that his oldest son has cerebral palsy and that he wanted to bring him to the United States before he attacked the mosque. *Id.* at 42–43; GX6B at 11. This suggested that the "make or break point" for the attack might have been when Bolatete arranged to bring his son to the United States, not when he

started receiving dialysis. D90 at 43–44; GX6B at 11.

Finally, they discussed the difficult Muslim customer. D90 at 44. The detective stated, "When … you were talking about putting a hit on the guy the other day. That got me to thinking … we can help each other." GX6B at 12. Bolatete responded, "You know you can use … that suppressor on that guy." *Id.* The detective then suggested that Bolatete could help him shoot the customer and that he could help Bolatete attack the mosque. D90 at 44–45; GX6B at 12. Bolatete replied that if the detective intended to "execute" the Muslim customer, he should refrain from making a "big fuss" about their dispute so that he would not become a suspect. *Id.* at 44–46; GX6B at 12. Bolatete also laughed and said, "I think … it's better not to really kill the guy, you know? Just … shoot him and let him realize … how valu[abl]e life is." GX6B at 12.

Eventually, they arrived at Bolatete's house, got out of the car, and had a short conversation. D90 at 46; GX6E. When the detective said he would ask his friend about the silencer, Bolatete stated, again, "You can use the suppressor … on the [difficult Muslim customer], you know." GX6E at 1. The detective responded, "Or when you go to the mosque." *Id.* Bolatete replied, "No need for a suppressor there," and, "I don't need the suppressor." *Id.* at 1–2.

16

At this point, the detective feared that he might have blown his cover by offering too much help and trying too hard to gain Bolatete's trust. D90 at 49–51, 141, 150, 156–57. He felt that way because of Bolatete's demeanor and the way they had parted company. *Id.* at 51–52, 150–52. But he wanted to continue the investigation because Bolatete owned and could use firearms, claimed to have committed acts of violence in the Philippines, disliked Muslims and people from the Middle East, wanted to attack the mosque, and had told others about his plan. *Id.* at 53–54, 140–41, 156–57. So the detective called his supervisor and shared his concerns. *Id.* at 51, 142. (The detective accidentally recorded his side of this call. *Id.* at 51; GX6D, GX6F.)

During the conversation with his supervisor, the detective summarized certain topics that he and Bolatete had discussed that day (including that Bolatete had rejected his offer to help him attack the mosque) and explained that Bolatete did not want a rifle or a silencer. GX6F at 1–2. He also suggested that they consider investigating Nerio. *Id.* He then said he would start rebuilding trust by sending Bolatete information about "shit that Muslims are doing" to show Bolatete that he hates Muslims, that Muslims are killing people, and that "it's time … to do stuff to them." D90 at 52, 147–48; GX6F at 2 (quotations). But the investigation continued to focus on thwarting Bolatete's plan to attack the mosque. D90 at 143–44, 156–57.

17

On the same day, the detective sent Bolatete a text message thanking Bolatete for taking him shooting and saying he "can't wait to get [his] own rifle." GX2C at 11. Bolatete responded, "You're always welcome, buddy. Till next time!" *Id.* About nine hours later, Bolatete sent the detective a text message inquiring whether he had bought the rifle. D90 at 55, 142–43, 160; GX2C at 11. (At this point, Bolatete would have known—based prior conversations with the detective—that the detective might be buying the rifle and silencer together. D90 at 160–61.) The next morning, the detective said he was still negotiating with his friend.  GX2C at 12.

On November 26, Bolatete asked the detective about the rifle. D90 at 56; GX2C at 12. The detective said he expected to pay $300 for the rifle plus another $100 if he wanted the silencer. GX2C at 12. (The detective mentioned the silencer not because he was trying to sell it to Bolatete, but because the rifle and silencer were part of a package deal. D90 at 146.) He also said that he and his friend were investigating the licensing requirement. GX2C at 12. (Bolatete and the detective previously had discussed the licensing requirements for silencers and automatic weapons. D90 at 56.) Bolatete replied, "Cool. A good price buddy!" GX2C at 12.

On November 27, the detective visited the liquor store. D90 at 57. He planned to confirm that Bolatete still trusted him and stay in touch with

Bolatete in the hope that Bolatete might reveal information that would help him prevent the mosque attack. *Id.* at 57–58. He did not intend to renew his offer to procure a silencer for Bolatete. *Id.* at 58.

Bolatete asked the detective whether he had found a "solution" for the difficult Muslim customer. D90 at 59; GX7B at 1. When the detective said "no," Bolatete stated, "[Y]ou can use the silencer for that guy." GX7B at 1–2. They also discussed that the detective should use "something small" to "warn" the customer. *Id.* at 2.

Bolatete and the detective then discussed their activities over the preceding weekend. GX7B at 2. When Bolatete inquired about the rifle, the detective said that he intended to buy the rifle, that the only question was whether he would also buy the silencer, and that he and his friend were exploring whether he could transfer the silencer license or would need to obtain a new license. *Id.* at 2–3. Bolatete told the detective he should not register the silencer in his own name because the license would authorize officers to enter his home to inspect the silencer without a search warrant. D90 at 60–61; GX7B at 3–4. (This was the first time anyone mentioned owning an unregistered silencer. D90 at 62–63.)

At this point, Bolatete stated that he also was "trying to buy" a silencer and that, if the detective's friend had more silencers available for sale, he

19

would be "willing to buy" one for the same price ($100). D90 at 61–62, 147;
GX7B at 4–5 (quotations at 4). Bolatete emphasized he would buy only an
unregistered silencer. D90 at 62; GX7B at 4. The detective responded by
offering to buy the one that was already in play and resell it to Bolatete. GX7B
at 4.

As they discussed the detective's offer and the characteristics of various
silencers, the detective said his friend might have at least four or five of them.
GX7B at 5. Bolatete suggested that a longer silencer might be quieter than the
one they had tested. *Id.* at 6–7. He reiterated that he had used a silencer when
he had shot a man in the Philippines and explained that he had learned about
the licensing requirement when he had looked into buying a silencer at a gun
shop immediately after he had moved to the United States. D90 at 65–66;
GX7B at 10–11. (At this time, Bolatete had been in United States for about
eight years. *See* D91 at 21; PSR ¶ 30.) And he repeatedly said he would buy
only an unregistered silencer. GX7B at 4–6, 9–11; *see* D90 at 60–65.

Eventually, they agreed that the detective would buy the silencer and
deliver it to Bolatete. D90 at 64, 67–68; GX7B at 8–9, 12–13. As the detective
left, he asked Bolatete to update him on his upcoming medical appointment.
GX7B at 12–13.

Later that day, the detective sent Bolatete the following text message: "I

just talked to him and he has more suppressors. Trying to get a good price for you too!! Will let you know what I can get him down too for it." GX2C at 12. Bolatete responded, "Thank you so much buddy. Here from you again soon." GX2C at 12.

Over the next few days, the detective and Bolatete exchanged numerous text messages. GX2C at 12–16. They discussed the detective's ongoing negotiations to buy the silencer and arranged a meeting in which the detective would resell it to Bolatete. D90 at 69–71, 75–85; GX2C at 12–16. (Bolatete never expressed any hesitation about buying the silencer. D90 at 86.) Bolatete said he wanted a silencer the same size or a little newer than the one they had tested and reminded the detective to obtain the attachment used to install it. *Id.* at 78–81; GX2C at 14. Bolatete also stated:

> Was thinking of putting that on a need basis on my pistolized AR, that we fired last time because that one is unregistered & it will be difficult to trace just in case, besides, it shorter to carry in a vehicle. Altho the suppressor is not really that "quiet" but it can be used on the 4th of July or New Year time, it can easily blend in with the sound of fireworks. I think that's the right time you can hit that asshole that you have there. That's why at this point, don't ever display yourself arguing w/ that asshole so that you'll not be considered a person of interest when you hit that guy. Better still, have a surveillance where he is frequenting & if you can point him to me, I'll take him for you guys. Pls delete this message after you read it so that it can't be found in your celfon just in case investigators will try to connect us. Get what I mean buddy?

GX2C at 13; *see* D90 at 71–75 (detective's testimony explaining that when

Bolatete said he was thinking of putting "that" on one of his firearms, he was referring to the silencer; that when Bolatete referred to "that asshole," he was referring to the difficult Muslim customer; and that when Bolatete said he would "take him," he was saying that he would use the silencer to shoot or kill the customer).

On December 1, Bolatete met the detective in the parking lot of a sporting goods store. D90 at 86–87. After the detective showed Bolatete a box that contained the silencer and other items, they got into Bolatete's car so that Bolatete could inspect the box's contents. *Id.* at 91–94. Inside the car, the detective showed Bolatete how to attach the silencer to his firearm, *id.* at 98, and Bolatete directed the detective to leave the box on the floor of the car, *id.* at 95, 98, 103–04, 179; GX9D; GX9E. They then walked to the back of the car, where Bolatete paid the detective $100. D90 at 88, 94–98; GX8D, GX8F. (The parties stipulated that the silencer was not registered to Bolatete and that he had not applied to register it. D90 at 218, 235–36; GX12.)

After they completed the transaction, they entered the sporting goods store. D90 at 95, 98–99. Inside the store, they discussed the firearms Bolatete planned to use at the mosque and the proper way to attach the silencer. *Id.* at 99; GX8B at 3–7. Bolatete confirmed he would not use the silencer at the mosque. D90 at 99; GX8B at 4, 6.

22

When they left the store, officers arrested Bolatete, pretended to arrest the detective, and put them in a vehicle. D90 at 100. Inside the vehicle, Bolatete asked the detective whether he was wearing a "wire." GX8B at 10. He also stated, "They have been following you." *Id.* at 12.

### (3)    *The Searches of Bolatete's Car and Bedroom*

The officers conducted an inventory search of Bolatete's car. D90 at 173–74, 207. On the floor of the front passenger side, they found a box containing the unregistered silencer, two boxes of ammunition, and other items. D90 at 179–81, 188; GX8D, GX8F, GX9D, GX9E, GX9F. Elsewhere in the car, they found two handguns with loaded magazines, four additional magazines, and additional rounds of ammunition for various firearms. D90 at 181–87; GX9G through GX9J. The car contained a total of 293 rounds of ammunition. D90 at 186. (The unregistered silencer was the only illegal item in Bolatete's car. D90 at 187–88.)

The officers also conducted a consent search of Bolatete's bedroom in his sister-in-law's home and a locked cabinet in that room. D90 at 173, 207–23; D91 at 46; GGX10D, GX10E, GX10F. In the cabinet, they found two rifles, several magazines for various firearms, about 2500 rounds of ammunition, and several shell casings. D90 at 220–23; GX10H, GX10O. (Those items were not illegal. D90 at 225; D91 at 34.)

23

### (4)    *Bolatete's Post-Arrest Interview*

Bolatete waived his constitutional rights and agreed to answer questions. D91 at 7, 9, 15; GX11A.[4] When the interviewer told Bolatete he had been arrested for possession of an unregistered silencer, Bolatete claimed he had obtained it so he could "try it." GX11A (first file; 19:44 to 20:06). Later, Bolatete said he planned to get a hunting license and go deer hunting with some of his customers. *Id.* (first file; 36:05 to 36:19). Bolatete asserted that when the detective had said his friend was trying to sell some firearms and silencers, Bolatete had responded that "that would be great," and that silencers are "used for hunting." *Id.* (first file; 38:25 to 39:55). He also asserted he had told the detective he would "try" one of the silencers and, if he liked it and the price was right, he would buy it and "have it registered in [his] name." *Id.* (first file; 39:55 to 40:29).

As the interview continued, Bolatete repeated his claims that he had wanted a silencer for hunting and that he had intended to register it. GX11A (first file; 40:31 to 40:49; 1:10:39 to 1:11:30) (second file; 10:58 to 11:09). He also repeated his claim that the detective had given him the silencer so he

---

[4]GX11A is a videotape of the interview. It contains two video files. D91 at 28; GX11A. Because the transcript was not admitted at trial, D91 at 16–19, 24–28, citations to the interview include the video file and the pertinent numbers on the tape counter.

could "test it," explaining that he had paid for it with the understanding that he could return it if he did not like it. *Id.* (first file; 1:11:40 to 1:12:18). In addition, he repeated his claim that he had told the detective he would have to register the silencer if he were to buy it. *Id.* (first file; 1:12:18 to 1:12:48).

At this point, the interviewer asked Bolatate to be more candid about his claim that he had intended to register the silencer because one of his text messages had suggested he never intended to register it. GX11A (second file; 4:51 to 6:10). Bolatete responded that he was "not so sure" who the detective was. *Id.* (second file; 6:10 to 6:26). He then asserted that for several reasons, including that the detective had said he hated Muslims and wanted to kill the difficult Muslim customer, he had been on a "fishing expedition" to find out "who this guy really is." *Id.* (second file; 6:26 to 10:02) (quotation at 9:09 to 9:17). And, when the interviewer told Bolatete he also had a recording in which Bolatete had said he wanted an unregistered silencer, Bolatete reiterated that he had been "playing along" to "fish out … who [the detective] really is." *Id.* (second file; 11:54 to 14:36) (quotations at 12:20 to 12:29 and 12:46 to 13:00).

At the end of the interview, the interviewer said that he knew Bolatete had asked the detective for an unregistered silencer, that he wanted Bolatete to "acknowledge[e] this issue," and that he knew the detective had not "push[ed]

25

this on" Bolatete. GX11A (second file; 14:37 to 16:17) (quotations at 14:45 to 14:54 and 15:16 to 15:21). Bolatete did not dispute or otherwise respond to the interviewer's statement that the detective had not pushed Bolatete to buy the unregistered silencer. D91 at 42–43. Nor did he assert that the detective had pressured him to the buy the unregistered silencer. D91 at 43–44. Instead, Bolatete said the detective had wanted to trade the silencer for a handgun. D91 at 42; GX11A (16:17 to 16:43).

## B.    The Sentencing

The United States Probation Office recommended a sentencing guidelines range of 41 to 51 months in prison, based on a total offense level of 22, including a four-level increase because Bolatete had possessed the silencer "in connection with" or "with knowledge, intent, or reason to believe that it would be used or possessed in connection with" another felony offense, USSG §2K2.1(b)(6)(B),[5] and a criminal history category of I. PSR ¶¶ 13–22, 25, 61.

Bolatete filed a sentencing memorandum. D75. He objected to the four-level increase and opposed any upward departure or variance because his plan to attack the mosque and his offer to use the silencer to shoot the problem Muslim customer had been mere "talk," not a felony offense. *Id.* at 2–5. He

---

[5]All citations to the sentencing guidelines refer to the November 1, 2016, manual. *See* PSR ¶ 13.

also requested a downward variance to a sentence of time served (about nine months) in prison based on the sentencing factors in 18 U.S.C. § 3553(a), *id.* at 5–14, and submitted medical records, D76; D77.

The United States filed a sentencing memorandum in which it argued that, with or without the challenged increase, the district court should depart or vary upward to the 10-year, statutory-maximum term of imprisonment. D72. It argued that the court could depart upward on several grounds, *id.* at 2–4, 6–11 & n.1, or could vary upward based on the section 3553(a) factors, *id.* at 4–11. And it based those arguments primarily on the following factors: (1) Bolatete hated Muslims and planned to commit "suicide by cop" by conducting a mass shooting at a mosque; (2) he claimed to have used a silencer when he shot someone in the Philippines; (3) when he learned that the detective had access to silencers, he asked to buy an unregistered silencer so he could avoid police scrutiny; (4) when he bought the silencer, he brought three loaded firearms to the deal; (5) he encouraged the detective to shoot the problem Muslim customer and explained how the detective could avoid getting caught; (6) he later offered to use the silencer to shoot the problem Muslim customer himself; (7) he asked the detective to delete an incriminating text message in which he had discussed the silencer and offered to shoot the customer; and (8) he lied during his interview. *Id.* at 6–10.

27

At sentencing, Bolatete objected to the increase based on the arguments in his sentencing memorandum. D92 at 4, 6–10; D93 at 3, 7; *see* PSR Addendum. The district court overruled the objection because Bolatete had offered to use the silencer in shooting the problem Muslim customer, the word "potential" in the pertinent commentary "cast[s] a very wide net," and the silencer had the "potential effect of facilitating" an attack on the customer. D93 at 3–7 (quotations at 6–7). The court then adopted the PSR and determined that Bolatete's sentencing guidelines range was 41 to 51 months in prison, based on a total offense level of 22 and a criminal history category of I. D83 at 1; D93 at 8.

Bolatete asked the district court to vary downward and sentence him to time served (about nine months). D92 at 14–15, 29–33. He emphasized his age (70), his lack of a prior criminal record, his good reputation in the Philippines, his family situation and poor health, his immigration status, his assertion that his statements to the detective had been a "bunch of talk," and his claim that "boastful talking … is part of the Philippine culture." *Id.* at 12–13, 30–33. He asserted that he had told the detective he would not attack the mosque because he wanted to bring his son to the United States. *Id.* at 13. He introduced several friends and family members and presented the testimony of two of his siblings. *Id.* at 17–24. And, during allocution, he emphasized his family

28

situation and poor health, asserted he had "invent[ed] stories of toughness …

to gain authority and respect," acknowledged that he had "messed up,"

apologized to the Jacksonville Muslim community, requested mercy, and

asked the court to let him die with his family in the Philippines. *Id.* at 24–29.

Relying on the arguments in its sentencing memorandum, the United

States asked the district court to depart or vary upward to the 10-year,

statutory-maximum term of imprisonment. D92 at 11, 15–17, 33–37. It argued

that, in light of the trial evidence and Bolatete's statements to the detective

(including his offer to use the silencer to shoot the problem Muslim customer),

the 10-year sentence was necessary to protect the public and afford adequate

punishment. *Id.* at 36–37. It also argued that Bolatete's own words were the

best evidence of his intent. *Id.* at 15. With respect to Bolatete's assertion that he

had told the detective he would not attack the mosque because he wanted to

bring his disabled son to the United States, the United States argued that

Bolatete had never said that. *Id* at 16; *see* GX6B at 11 (statement by Bolatete:

"I'll still let [my eldest son] see America *first before* I [unintelligible]") (emphasis

added). To the extent that Bolatete claimed his statements were "just big talk,"

the United States noted that during his opening statement, Bolatete's counsel

had suggested that the confidential source in this case had been Bolatete's

mother's female caretaker. D92 at 34–35; *see* D89 at 132 (counsel's opening

statement). It then argued that even if Bolatete thought he needed to "talk big" to the detective, he had no reason to "put on an act" for the caretaker. D92 at 34–35. And, with respect to Bolatete's request for a lenient sentence based on his poor health, it emphasized that Bolatete's poor health had actually influenced his plan to attack the mosque. *Id.* at 35.

The district court imposed a 60-month term of imprisonment. D82; D93 at 9–13. In doing so, it granted in part the United States motion for an upward departure or variance, D83 at 3; D93 at 9, and said it would have imposed the same sentence even without the four-level increase, D93 at 9–10. It also said it had considered the PSR, the advisory sentencing guidelines, the sentencing factors in section 3553(a), the parties' sentencing memoranda, and the testimony of Bolatete's witnesses. D92 at 3, 6, 29; D93 at 3, 11–13. The court emphasized the evidence at trial and the facts in the PSR, including Bolatete's plan to attack the mosque, his suggestion that it would be better to wound the problem Muslim customer than to kill him, his request that the detective delete an incriminating text message, and the need to provide for general and specific deterrence and protect the public. D93 at 10–11, 13, 16. Finally, the court determined that the sentence was sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. *Id.* at 13.

Bolatete objected to the upward variance as "factually and substantively

30

unreasonable." D93 at 14. The United States acknowledged that it may have "muddied the waters" by requesting an upward departure and an upward variance and asked the court to clarify the basis for the sentence. *Id.* The court responded: "Well, I did it in both. I would have sentenced him to 60 months … if I didn't grant the probation officer's request for the upward departure [*sic*] to get the four levels added." *Id.* The court also said a 10-year term of imprisonment would have been too long given Bolatete's advanced age and poor health. *Id.* at 15. (In the statement of reasons, the court checked the boxes that apply only to upward variances. D83 at 2–3.)

After the district court responded to the United States' inquiry, Bolatete modified his objection. D93 at 15. He said that he had intended to object "to the upward departure and/or variance as factually and substantively unreasonable." *Id.*

### Standard of Review

I. II.  Bolatete challenged 26 U.S.C. § 5861 on the ground that it exceeded Congress's power to tax and infringed on powers reserved to the states by the Tenth Amendment, but he did not challenge it on the ground that it violated the Second Amendment. *See* D42. Therefore, this Court should review his claims based on Congress's taxing authority and the Tenth Amendment de novo and review his claim based on the Second Amendment

31

for plain error. *See U.S. v. Hughes*, 840 F.3d 1368, 1385 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1354 (2017).

III.    This Court should review de novo the district court's denial of Bolatete's motion for a judgment of acquittal based on his entrapment defense, viewing the evidence in the light most favorable to the verdict and making all reasonable inferences and credibility choices in favor of the government. *See U.S. v. Merrill,* 513 F.3d 1293, 1299 (11th Cir. 2008); *U.S. v. Brown*, 43 F.3d 618, 622 (11th Cir. 1995). The conviction "must be upheld unless the jury could not have found [Bolatete] guilty under any reasonable construction of the evidence." *Merrill,* 513 F.3d at 1299; *accord Brown*, 43 F.3d at 622.

IV.    This Court should review the district court's interpretation of the sentencing guidelines de novo and its factual findings for clear error. *U.S. v. Hano*, 922 F.3d 1272, 1283 (11th Cir. 2019). The finding that Bolatete possessed an unregistered silencer in connection with another felony offense under USSG §2K2.1(b)(6)(B) is a factual finding that is reviewed for clear error. *See U.S. v. Whitfield*, 50 F.3d 947, 949 & n.8 (11th Cir. 1995); *U.S. v. Smith*, 719 F. App'x 998 (11th Cir. 2018).

V.    This Court should review Bolatete's above-guidelines-range sentence for an abuse of discretion, taking into account the totality of the circumstances and the extent of the upward variance. *See Gall v. U.S.*, 552 U.S.

38, 50–51 (2007).

## Summary of the Argument

I.    The district court correctly determined that controlling authority foreclosed Bolatete's arguments that 26 U.S.C. § 5861 is unconstitutional because it exceeds Congress's taxing authority and infringes on powers reserved to the states by the Tenth Amendment.

II.    The district court did not plainly err by failing to determine sua sponte that 26 U.S.C. § 5861 is unconstitutional because it imposes a tax on the exercise of a Second Amendment right to possess silencers. The district court did not err because this Court has held that section 5861(d) does not infringe on the Second Amendment right to keep and bear arms, and other courts of appeals have explicitly rejected arguments similar to those raised by Bolatete. But, even if the district court erred, an error is not plain unless it is contrary to explicit statutory provisions or to on-point precedent in this Court or the Supreme Court. And, here, Bolatete has cited no such authority, and none exists.

III.    The evidence shows that Bolatete was interested in silencers long before the detectives contacted him, he claimed to have owned a silencer and to have used it when he shot someone in the Philippines, he looked into acquiring a silencer when he moved to the United States about eight years

33

before the investigation, he did not like the licensing requirement because it would have exposed him to additional scrutiny by authorities, and he leapt at the opportunity to buy an unregistered silencer when he realized the detective could help him get one. Viewing that evidence in the light most favorable to the verdict, a reasonable jury easily could have found that Bolatete was predisposed to possess an unregistered silencer years before the detectives contacted him. Therefore, the district court correctly denied Bolatete's motion for a judgment of acquittal based on his entrapment defense.

IV.    The district court correctly applied the four-level increase in USSG §2K2.1(b)(6)(B) because the silencer had the potential of facilitating another felony offense: an attack on the problem Muslim customer. The increase was supported by the record and consistent with the applicable law. And any error would have been harmless because the court said it would have imposed the same sentence without the increase and the sentence is not unreasonable (with and without the increase).

V.    The district court did not abuse its discretion by varying upward and imposing a 60-month term of imprisonment. The court was entitled to conclude that a substantial sentence was required to account for the nature, circumstances, and seriousness of the offense; Bolatete's personal history and characteristics; and the need to promote respect for the law, provide just

34

punishment, afford adequate deterrence, and protect the public. Those factors provide a compelling justification for the 60-month term, regardless of whether it includes a 9-month upward variance based on the sentencing guidelines range (41 to 51 months) as determined by the district court or a 27-month upward variance based on the range (27 to 33 months) that would have applied without the challenged increase. Moreover, the 60-month term is only half of the 120-month, statutory-maximum term.

## Argument and Citations of Authority

### I.    The district court correctly determined that controlling authority foreclosed Bolatete's arguments that 26 U.S.C. § 5861 is unconstitutional because it exceeds Congress's power to tax and infringes on powers reserved to the states by the Tenth Amendment.

Bolatete argues that 26 U.S.C. § 5861 is unconstitutional because it exceeds Congress's power to impose taxes under U.S. Const., Art. I, § 8, cl. 1, and infringes on powers reserved to the states by the Tenth Amendment. Bolatete's brief at 20–33. The district court correctly determined that controlling authority foreclosed those arguments. *See* D54.

In *Sonzinsky v. U.S.*, 300 U.S. 506, 512–14 (1937), the Supreme Court held that the NFA was a valid exercise of Congress's power to impose taxes. In reaching that holding, the Court rejected Sonzinsky's argument that "the present levy is not a true tax, but a penalty imposed for the purpose of

35

suppressing traffic in a certain noxious type of firearms, the local regulation of which is reserved to the states." *Id.* at 512. Following *Sonzinsky*, this Court and its predecessor reached the same holding. *See U.S. v. Spoerke*, 568 F.3d 1236, 1245–46 (11th Cir. 2009); *U.S. v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972); *U.S. v. Matthews*, 438 F.2d 715, 716–17 (5th Cir. 1971). Because *Sonzinsky*, *Spoerke*, *Ross*, and *Matthews* are still good law, they foreclose Bolatete's claims based on Congress's taxing authority and the Tenth Amendment. *See U.S. v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (appellate courts are bound by controlling Supreme Court precedent), *petition for cert. filed*, No. 18-9399 (May 21, 2019); *U.S. v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) (this Court must follow controlling precedent that has not been overruled by this Court sitting en banc or by Supreme Court).

Bolatete argues that this Court should reexamine the constitutionality of the NFA because: (1) the amount ($200) of the tax on the registration of specified items has remained unchanged since 1934; (2) responsibility for enforcing the NFA has been transferred from the Department of the Treasury to the Department of Justice; and (3) over time, the NFA has "lost its character as a taxing statute and morphed into a law of regulation and punishment" that infringes on the powers reserved to the states under the Tenth Amendment. Bolatete's brief at 20–33 (quotation at 29). As previously discussed, this Court

is bound by *Sonzinsky*, *Spoerke*, *Ross*, and *Matthews*. In any event, Bolatete's

arguments lack merit for the same reasons that the Tenth Circuit concluded

that similar arguments lacked merit in *U.S. v. Cox*, 906 F.3d 1170, 1180–83

(10th Cir. 2018) (analyzing appellants' arguments in light of *Sonzinsky* and

other pertinent Supreme Court authority and holding that "though times may

have changed since the [Supreme] Court decided *Sonzinsky* in 1937,

[appellants] point to no differences, either in the NFA or in courts'

understanding of the national taxing power, that justify departing from

*Sonzinsky*'s conclusion that the NFA is a valid exercise of Congress's power"),

*petitions for cert. filed*, Nos. 18-936 and 18-7451 (Jan. 14, 2019).

## II.   The district court did not plainly err by failing to determine sua sponte that 26 U.S.C. § 5861 is unconstitutional because it imposes a tax on the exercise of a Second Amendment right to possess silencers.

Bolatete argues, for the first time, that section 5861 is unconstitutional

because it taxes the exercise of a Second Amendment right to possess silencers.

Bolatete's brief at 33–41. To obtain relief, he "must show that: (1) an error

occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it

seriously affected the fairness of the judicial proceedings." *U.S. v. Schultz*, 565

F.3d 1353, 1356–57 (11th Cir. 2009). He has not done so.

First of all, the district court did not err by failing to dismiss the

indictment sua sponte on this ground. This Court and its predecessor have held that section 5861(d) does not infringe on the Second Amendment right to keep and bear arms. *U.S. v. Tagg*, 572 F.3d 1320, 1325–27 (11th Cir. 2009); *U.S. v. Wright*, 117 F.3d 1265, 1271–74 (11th Cir. 1997), *modified on rehearing on other grounds*, 133 F.3d 1412 (11th Cir. 1998); *U.S. v. Williams*, 446 F.2d 486, 487 (5th Cir. 1971); *U.S. v. Johnson*, 441 F.2d 1134, 1135–36 (5th Cir. 1971). And other courts of appeals have explicitly rejected arguments similar to those raised by Bolatete. *See Cox*, 906 F.3d at 1186–88 (silencers are not protected by the Second Amendment because they are accessories, not bearable arms; under any standard of review, the NFA does not tax the exercise of a constitutional right to possess silencers because the Second Amendment does not apply to silencers); *U.S. v. Stepp-Zafft*, 733 F. App'x 327, 329–30 (8th Cir.) (district court did not plainly err by failing to dismiss indictment sua sponte on grounds that Second Amendment applies to silencers and that section 5861(d) unconstitutionally burdens Second Amendment right to possess silencers), *cert. denied*, 139 S. Ct. 279 (2018); *U.S. v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (silencers not protected by Second Amendment).

But, even if the district court had erred, any error would not have been plain. "An error is not plain unless it is contrary to explicit statutory provisions or to on-point precedent in this Court or the Supreme Court." *Schultz*, 565 F.3d

at 1357. Bolatete has cited no such authority, *see* Bolatete's brief at 33–41, and none exists.

### III.    The district court correctly denied Bolatete's motion for a judgment of acquittal based on his entrapment defense.

Bolatete argues that the district court erred in denying his motion for a judgment of acquittal because the evidence failed to prove that he had been predisposed to possess an unregistered silencer before the investigation. Bolatete's brief at 41–48. He is wrong.

"A successful entrapment defense requires two elements: (1) government inducement of the crime, (2) and lack of predisposition on the part of the defendant." *U.S. v. Brown*, 43 F.3d 618, 623 (11th Cir. 1995). "The defendant bears an initial burden of production to show government inducement." *Id.* "Once the defendant makes the initial showing, the burden shifts to the government to prove that the defendant was predisposed to commit the crime." *Id.*

When a jury rejects an entrapment defense, as Bolatete's jury did here, D63; D91 at 129–131, this Court's "review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." *Brown*, 43 F.3d at 622. "[T]he predisposition inquiry is a purely subjective one which asks the jury to

consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's officers or agents." *Id.* at 624. It focuses on the defendant's predisposition before any contact with government officers or agents. *Id.* at 627. Consequently, predisposition "is necessarily a fact-intensive inquiry because it is a subjective inquiry into a defendant's state of mind." *Id.* at 625.

Here, Bolatete was not an "unwary innocent," but an "unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *U.S. v. Isnandin*, 742 F.3d 1278, 1298 (11th Cir. 2014) (internal quotation marks omitted). As explained below, the evidence shows that Bolatete was predisposed to possess an unregistered silencer because he was interested in silencers long before the detectives contacted him, he claimed to have owned a silencer and to have used it when he shot someone in the Philippines, he looked into acquiring a silencer when he moved to the United States about eight years before the investigation, he did not like the licensing requirement because it would have exposed him to additional scrutiny by authorities, and he leapt at the opportunity to buy an unregistered silencer when he realized the detective could help him get one. *See generally* Statement of the Facts, Part A.

During the investigation, Bolatete was the first one to mention silencers, D90 at 131; GX4B at 3; GX5B at 3–4, and unregistered silencers, D90 at 60–

40

63; GX7B at 3–4. He exhibited a good working knowledge of silencers. D90 at 39–40. He could not have obtained that knowledge overnight. And he did not get it from the detective. Indeed, he acknowledged that he had owned a silencer and had used it when he shot someone in the Philippines, D90 at 28; GX5B at 3–4; GX6B at 7–8; GX7B at 10, and that he had discovered the licensing requirement when he had looked into buying a silencer immediately after he had moved to the United States, D90 at 65–66; GX7B at 10–11. (Bolatete moved here about eight years before the investigation. D91 at 21; PSR ¶ 30.) He knew authorities in the United States are "very hot" on silencers. GX6B at 6. And he did not like the licensing requirement because it would have exposed him to additional scrutiny by authorities. Doc. 90 at 60–61; GX7B at 3–6, 9–11.

Bolatete rejected the detective's initial offer to resell the silencer to Bolatete. D90 at 35–36, 135–36; GX6B at 4, 6; GX6E at 1–2; GX6F at 1–2. And the detective had no plans to renew the offer. Doc. 90 at 57–58. But Bolatete knew the rifle and silencer were part of a package deal. D90 at 160–61. And he repeatedly asked the detective about the detective's negotiations to buy the rifle. D90 at 55–56, 142–43, 160; GX2C at 11–12; GX7B at 2.

When the detective said that, during the negotiations to buy the rifle, he and his friend were exploring whether they could transfer the silencer license

41

or would need to obtain a new license in the detective's name, GX7B 2–3, Bolatete immediately told the detective he should not register the silencer in his own name because the license would authorize officers to enter his home to inspect the silencer without a search warrant, D90 at 60–61; GX7B at 3–4. He also stated that if the detective's friend had more silencers available for sale, he would buy one for the same price ($100). D90 at 61–62, 147; GX7B at 4–5. He emphasized, however, that he would buy only an unregistered silencer. D90 at 62; GX7B at 4. Under the circumstances, Bolatete's offer creates a strong inference that he was predisposed to acquire an unregistered silencer.

At this point, the detective offered to buy the silencer from his friend and resell it to Bolatete for the same price. GX7B at 4. He also said his friend might have at least four or five silencers. *Id.* at 5. Bolatete encouraged the detective to procure a silencer that was newer and quieter than the one they had tested. D90 at 80; GX7B at 6–7. And he repeatedly emphasized that he wanted to buy only an unregistered silencer. GX7B at 4–6, 9–11; *see* D90 at 60–65.

Eventually, they agreed that the detective would buy the silencer from his friend and resell it to Bolatete. D90 at 64, 67–68; GX7B at 4–5, 8–9, 12–13. As they finalized their agreement, Bolatete never expressed any hesitation about buying the silencer. D90 at 86.

During his post-arrest interview, Bolatete falsely asserted he had told the

42

detective that he intended to register the silencer in his own name. GX11A
(first file; 39:55 to 40:29; 1:12:18 to 1:12:48). He did not claim that the
detective had pressured or persuaded him to buy the unregistered silencer. D91
at 42–44.

Viewing this evidence in the light most favorable to the verdict, a
reasonable jury easily could have found that Bolatete was predisposed to
possess an unregistered silencer years before the detectives contacted him.
Therefore, the district court correctly denied Bolatete's motion for a judgment
of acquittal based on his entrapment defense.

## IV.    The district court correctly applied the sentencing enhancement for possessing the silencer in connection with another felony offense and, in any event, any error would have been harmless.

Bolatete argues that the district court erred in applying the four-level
increase under USSG §2K2.1(b)(6)(B) because he never used the silencer to
shoot the problem Muslim customer, he took no affirmative steps to make
good on his offer to do so, and his "talk" was not relevant conduct. Bolatete's
brief at 48–53. This argument fails because the increase was supported by the
record and consistent with the applicable law, and any error would have been
harmless because the court said it would have imposed the same sentence even
without the increase and the sentence is not unreasonable (with and without

the increase).

Under section 2K2.1(b)(6)(B), a defendant qualifies for a four-level increase if he possessed a firearm "in connection with" another felony offense or "with knowledge, intent, or reason to believe that it would be used or possessed in connection with" another felony offense. "Firearm" includes a silencer. USSG §2K2.1, comment. (n.1); 18 U.S.C. § 921(a)(3). The increase applies if the silencer "facilitated, or had the potential of facilitating" another felony offense. USSG §2K2.1, comment. (n.14(A)). In determining whether the defendant qualifies for the increase, the sentencing court "must consider the relationship between the instant offense and the other offense, consistent with relevant conduct principles." *Id.* (n.14(E)).

Here, the district court found that the increase applied because the silencer had the potential of facilitating another felony offense: an attack on the problem Muslim customer. D93 at 3–7. That finding is fully supported by the record, which shows that Bolatete: (1) had a good working knowledge of silencers, D90 at 39–40; (2) claimed to have used a silencer to shoot someone in the Philippines, D90 at 65–66; GX5B at 3–4; GX7B at 10–11; (3) claimed he could "hit a headshot" with his Glock pistol at 25 yards, D90 at 164; GX2B at 5 (quote); (4) did not like Muslims, GX1B at 2–3; GX2C at 6; GX3B at 2–4, 6–7; GX4B at 1–2, 4–5; (5) encouraged the detective to use the silencer to shoot

44

the difficult Muslim customer, D90 at 14–16; GX5B at 2; GX6B at 12; GX6E at 1; GX7B at 1–2;  (6) eventually offered to use the silencer to shoot the customer himself, D90 at 71–75; GX2C at 13; and (7) asked the detective to delete an incriminating text message that contained the offer to shoot the customer so that investigators would not find it in his cellphone, GX2C at 13.

The district court's finding also is consistent with the plain language of section 2K2.1(b)(6)(B) and the pertinent commentary. Because Bolatete offered to use the silencer to shoot the difficult Muslim customer, he ultimately possessed it "with knowledge, intent, or reason to believe that it *would be* used or possessed in connection with another felony offense." USSG §2K.1(b)(6)(B) (emphasis added); *see U.S. v. Gay*, 746 F. App'x 886, 887 (11th Cir. 2018) (collecting cases in which other courts of appeals have concluded that section 2K2.1(b)(6)(B) applies when other felony offense is "only potential and had not actually occurred"), *cert. denied*, 139 S. Ct. 1280 (2019). His possession of the silencer also "had the potential of facilitating" another offense. USSG §2K.1(b)(6)(B), comment. (n.14(A)); *see U.S. v. Boylen*, 511 F. App'x 950, 952 (11th Cir. 2013) ("Undoubtedly, the firearms … 'had the potential of facilitating' *future* drug sales for Boylen.") (quoting USSG §2K2.1(b)(6)(B),

comment. (n.14(A)); emphasis added).[6]

Furthermore, the district court's finding is consistent with the relevant-conduct rules. While he was trying to acquire the silencer, Bolatete offered to use it to shoot the difficult Muslim customer. D90 at 71–75; GX2C at 13. He also asked the detective to delete the text message containing the offer so investigators would not find it in his cellphone. GX2C at 13. So, at a minimum, he made the offer "in preparation for" and "in the course of attempting to avoid detection or responsibility for" the offense of conviction. USSG §1B1.3(a)(1)(A). Bolatete's assertion to the contrary on page 51 of his brief ignores the plain meaning of that language.

In any event, as Bolatete acknowledges on pages 51 and 52 and in footnote 10 of his brief, an error in applying the sentencing guidelines is harmless when the district court says it would have imposed the same sentence without the error and the sentence would still be reasonable if the court had decided the guidelines issue in the defendant's favor. *U.S. v. Keene*, 470 F.3d 1347, 1349–50 (11th Cir. 2006). Here, the court said it would have imposed the

---

[6]On page 51 of his brief, Bolatete notes that in *Gay*, 746 F. App'x at 887, this Court observed that the question whether section 2K2.1(b)(6)(B) applies when the other felony offense is "only potential and had not actually occurred" is a question of first impression in this circuit. This Court's unpublished decision in *Boylen* supports the proposition that section 2K2.1(b)(6)(B) applies to such offenses.

same sentence without the four-level increase. D93 at 9–10, 14–15. And, as explained below in Argument IV, Bolatete has failed to show that the 60-month term of imprisonment—with or without the challenged increase—is unreasonable. Therefore, any error in applying the increase would have been harmless.

On pages 51 and 52 of his brief, Bolatete acknowledges that in *Gay*, 746 F. App'x at 887–88, this Court declined to consider whether section 2K2.1(b)(6)(B) applies to "potential" offenses because any error in applying it in that case would have been harmless. Nevertheless, he invites this Court to decide the issue here because it is a question of first impression in this circuit. Bolatete's brief at 52–53. As previously discussed, any error in applying the increase in this case would have been harmless. So this Court may decline to consider the issue here, too. *See Keene*, 470 F.3d at 1349 (quoting *U.S. v. Williams*, 431 F.3d 767, 773 (11th Cir. 2005) (Carnes, J., concurring), for proposition that "the Supreme Court and this Court have long recognized that it is not necessary to decide guidelines issues or remand cases for new sentence proceedings where the guidelines error, if any, did not affect the sentence") (brackets omitted).

For these reasons, this Court should conclude that the district court correctly applied the challenged increase and that any error in applying the

increase would have been harmless.

## V.    The district court did not abuse its discretion by varying upward and imposing a 60-month term of imprisonment.

Bolatete argues that the district court abused its discretion by varying upward from the sentencing guidelines range of 41 to 51 months in prison and imposing a 60-month term of imprisonment. Bolatete's brief at 53–58. According to Bolatete, the court failed to consider and properly weigh the relevant factors, and its justification for the sentence was not sufficiently compelling to support the extent of the variance. *Id.* Those arguments lack merit.[7]

The defendant has the burden to show that his sentence is unreasonable. *U.S. v. Sanchez*, 586 F.3d 918, 935 (11th Cir. 2009). A district court abuses its discretion in selecting a sentence when it: "(1) fails to afford consideration to relevant [section 3553(a)] factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear

---

[7]Bolatete also argues that the district court considered an improper factor by applying the increase in section 2K2.1(b)(6)(B). Bolatete's brief at 56–57. As explained above in Argument III, the court correctly applied the increase. But, even if it erred, any error would have been harmless because, as previously discussed in Argument III, the court said it would have imposed the same sentence without the increase and, as discussed below in this Argument IV, the sentence is not unreasonable. Therefore, the increase should play no role in the reasonableness inquiry.

error of judgment in considering the proper factors." *U.S. v. Osorio-Moreno*, 814 F.3d 1282, 1287 (11th Cir. 2016).

"The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *U.S. v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007) (internal quotation marks omitted). Although the court must evaluate all of the section 3553(a) factors, it may "attach great weight to one factor over others." *U.S. v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (internal quotation marks omitted). And it need not discuss every factor. *See  U.S. v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita v. U.S.*, 551 U.S. 338 (2007). A simple acknowledgment that the court has considered the section 3553(a) factors is sufficient. *Amedeo*, 487 F.3d at 832.

"The justifications [for any variance from the advisory guidelines range] must be compelling enough to support the degree of the variance and complete enough to allow meaningful appellate review." *Shaw*, 560 F.3d at 1238 (internal quotation marks omitted). "But the Supreme Court has specifically rejected the idea that an extraordinary justification is required for a sentence outside the guidelines range." *Id.*

"Because of its institutional advantage in making sentence determinations, a district court has considerable discretion in deciding whether

49

the § 3553(a) factors justify a variance and the extent of one that is appropriate." *Shaw*, 560 F.3d at 1238 (internal quotation marks and citation omitted). This Court must give the district court's decision "due deference" and may vacate a sentence because of a variance only if left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences. *Id.* That this Court might reasonably conclude that a different sentence was appropriate is insufficient to justify reversal. *Gall v. U.S.*, 552 U.S. 38, 51 (2007).

Here, Bolatete committed a serious offense. He explored the possibility of obtaining a silencer when he came to the United States. But he did not like the licensing requirement because it would have exposed him to additional scrutiny by authorities. So he leapt at the opportunity to buy the unregistered silencer when he realized the detective could help him get one. In addition, the investigation was triggered by a tip that Bolatete was planning a mass shooting at a local mosque. He said he wanted to attack the mosque because he did not like Muslims and people from the Middle East and, given his medical situation, he wanted to use his last moments to give them a taste of their own medicine. He also had the ability to carry out the attack because he was familiar with the mosque's layout, he owned multiple rifles, multiple pistols,

50

and thousands of rounds of ammunition, and he routinely carried loaded firearms and honed his skills at a local shooting range. Moreover, he claimed to have used a silencer when he shot someone in the Philippines. He possessed three loaded firearms when he bought the silencer. He repeatedly encouraged the detective to use the silencer to shoot the problem Muslim customer, told the detective how he could avoid getting caught, and later offered to use the silencer to shoot the customer himself. He also asked the detective to delete an incriminating text message in which he had discussed the silencer and offered to shoot the customer. Finally, during his post-arrest interview, he falsely asserted that he had told the detective that he intended to register the silencer.

On these facts, the district court was entitled to determine that a substantial sentence was required to account for the nature, circumstances, and seriousness of the offense; Bolatete's personal history and characteristics; and the need to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A)–(C). Those factors provide a compelling justification for the 60-month term of imprisonment, regardless of whether it included a 9-month upward variance based on the sentencing guidelines range (41 to 51 months) determined by the district court or a 27-month upward variance based on the range (27 to 33 months) that would have applied without the challenged

increase. Moreover, the 60-month term of imprisonment is only half of the 120-month, statutory-maximum term that applied to the offense of conviction. *See* 26 U.S.C. §§ 5861(d) and 5871. And that comparison is another indication that the sentence is a reasonable one. *See U.S. v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (comparing, as one indication of reasonableness, sentence imposed against statutory-maximum penalty).

To the extent that Bolatete argues that the district court failed to consider certain mitigating factors, Bolatete's brief at 55–56, the record refutes that assertion. The court listened to the presentations made by both parties. *See generally* D92; D93. It said it had considered the evidence presented at trial, the PSR, the advisory sentencing guidelines, the section 3553(a) factors, the parties' sentencing memoranda, and the testimony of Bolatete's character witnesses. D92 at 3, 6, 29; D93 at 3, 11–13. And it determined that the sentence was sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. D93 at 13. That is all the court needed to do. *See Rita v. U.S.*, 551 U.S. 338, 358–59 (2007) (where context and record make clear that sentencing court listened to each argument and found the circumstances insufficient to warrant lower sentence, extensive explanation is not required); *Talley*, 431 F.3d at 786 (acknowledgment that district court considered section 3553(a) sentencing factors and parties' arguments is

sufficient).

Ultimately, Bolatete's substantive-unreasonableness claim boils down to an argument that this Court should second-guess the district court's weighing of the section 3553(a) factors. This Court has made clear, however, that it will not substitute its judgment for that of the district court, *Amedeo*, 487 F.3d at 832, and that it will reverse a procedurally proper sentence only if convinced that the district court committed a clear error of judgment in weighing the § 3553(a) factors by imposing a sentence that lies outside the range of reasonable sentences dictated by the facts of the case, *U.S. v. McBride*, 511 F.3d 1293, 1297–98 (11th Cir. 2007); *accord U.S. v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc). Bolatete's sentence does not fall outside that range.

For these reasons, the district court did not abuse its discretion by varying upward to a 60-month term of imprisonment.

## Conclusion

The United States requests that this Court affirm the judgment and sentence of the district court.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:    *s/ Peter J. Sholl*
PETER J. SHOLL
Assistant United States Attorney
Appellate Division
USA No. 082
400 M. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
peter.sholl@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 12,971 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was

sent by CM/ECF on June 7, 2019, to:

LYNN PALMER BAILEY
Federal Public Defender's Office

*Counsel for Bernandino Bolatete*

*s/ Peter J. Sholl*
PETER J. SHOLL
Assistant United States Attorney

gkpr no 6/7/19

*b_Bolatete, Bernandino_ U.S. brief FINAL pxs.docx*