[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14184
_____

D.C. Docket No. 3:17-cr-00240-HES-JBT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BERNANDINO GAWALA BOLATETE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 29, 2020)

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

At 70 years old and in failing health, Bernandino Bolatete decided that his

last act on this Earth would be one of hatred and violence. He made plans to climb

to the top of a tower at a mosque in Florida and shoot innocent Muslims. He had an arsenal of rifles to carry out the attack and knew how to use them. Fortunately, someone overheard Bolatete talking about his plans and reported him to law enforcement. An undercover detective gained Bolatete's trust, confirmed that he planned to attack the mosque, and then sold him an unregistered firearm silencer. Because possessing an unregistered silencer is a federal crime, Bolatete was arrested, convicted, and sentenced to prison where he is today.

The district court rejected Bolatete's constitutional challenge to the statute making it a crime to receive or possess an unregistered firearm silencer. The court sentenced him to 60 months in prison. This is his appeal of his conviction and sentence.

## I. BACKGROUND

### A. Facts

In late 2017, the Jacksonville Sheriff's Office received a tip that Bolatete was planning to commit a mass shooting at a local mosque. The person who provided the tip said that Bolatete had just been given some "bad news" about the condition of his one remaining kidney and would have to start dialysis soon. She reported that Bolatete was going to time the mass murder for when he otherwise would have had to start dialysis; apparently, he did not plan on surviving his crime.

A Sheriff's Office detective with a long resumé of undercover work was assigned to investigate.  The detective's plan was to take on an undercover persona as a Muslim-hating gun enthusiast named "Drew" and gain Bolatete's trust so he could find out if he was serious about killing Muslims at the mosque.  The detective introduced himself as Drew at the liquor store where Bolatete worked, and the two of them bonded over their "shared" hatred of Muslims and love of guns.

Less than two weeks after the detective and Bolatete met, they went to a shooting range together.  The detective drove Bolatete to the range in a car that had been wired to covertly record video and sound.  Their route took them by the mosque that Bolatete had planned to attack, and as they drove by, the detective made a comment about the mosque.  That passing comment was all it took to get Bolatete to start sharing his violent plans.

Bolatete pointed out a tower near the mosque and said that was where he was "planning to stay" after his kidney doctor told him it was time to start dialysis. By "stay," he meant that he would go up the tower and start "shooting those Muslims" until the police killed him.  Bolatete said that he wanted to "try a Christian doing [a] terroristic . . . act this time . . . to the Muslims," because Muslims were "doing it all the time."  The detective asked Bolatete: "You[']re just going to climb up in the tower and — "  Bolatete answered that yes, he was just

going to "go up to the tower and start shooting." He laughed and asked his new friend: "[I]t will be great, right?"

Even though Bolatete was laughing, his plan was no joke. He explained that he had already gone onto the mosque property to scope out the tower and make sure he could get in it. He had learned that the best day to carry out the attack would be a Friday, when Muslims attend religious services. And he had an arsenal of five rifles, including an AR-15 assault rifle, that he could use to carry out the attack. He told the detective that his next kidney appointment was less than a month away. Time was running out.

Over the next ten days, the detective and Bolatete exchanged text messages and spent more time together, and Bolatete twice steered their conversation toward firearm silencers.[1] The first time he mentioned silencers was while the detective was driving him home from a second trip to the shooting range together. The two men were talking about the availability of automatic weapons in the United States compared to the Philippines, where Bolatete was born, when Bolatete said, unprompted: "You can even, uh, get the suppressors there." The detective had never mentioned suppressors or silencers (which are the same thing) when Bolatete brought up the subject.

---

[1] For purposes of the federal statute, a silencer is "any device for silencing, muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 921(a)(24); see 26 U.S.C. § 5845(a)(7).

The second time Bolatete brought up silencers was at the liquor store when the detective visited him on November 20.  As part of his undercover story, the detective told Bolatete that he and his boss had done some electrical work for a Muslim client who had refused to pay them, costing his boss $30,000.  Bolatete responded that the "only thing to do is, uh, shoot him somewhere."  He recounted that there had been "one asshole like that in, um, in the Philippines," and he had settled their differences by shooting the man with a .22 caliber pistol equipped with a silencer.  Bolatete suggested that the detective and his boss could do something similar to deal with their problem client.  He advised that they should "study [the client's] movements" and "hit" him in a rough part of town.  He also recommended taking the client's wallet after the hit so that it looked like a robbery gone wrong.

Because Bolatete had mentioned silencers twice, the detective decided to gauge his interest in buying one.  The next time they went to the shooting range, on November 24, the detective brought a rifle that had a silencer attached.  His story was that he had borrowed the rifle and silencer from a friend who was in financial trouble and needed to sell all of his guns.  He told Bolatete that his friend was selling the rifle for $300 or $400.

After they shot the rifle together, Bolatete told the detective that $300 would be a good price, especially if it included the silencer.  The detective offered to buy the silencer from his friend and sell it to Bolatete.  Bolatete did not say anything in

response to that offer but he nodded and, according to the detective, appeared interested. Bolatete also commented that the silencer was not very silent, that it was much louder than the one that he had on his .22 caliber pistol in the Philippines, and he added that it was louder than it should have been even considering the bigger powder load of a rifle round. His appraisal was not all criticism, though. He did offer his view that the silencer was attached to the rifle very well. Bolatete knew a thing or two about silencers.

During the drive home, Bolatete called a friend of his — another gun enthusiast — and spoke with him in a language that the detective couldn't understand. Then he told the detective that according to his friend, $300 for the rifle was a "giveaway price" and if the silencer were included it would be even better. But, Bolatete noted, there was no need for the silencer because they were not going hunting (where a silencer would be useful to avoid scaring off the animals). He also warned the detective that the police were "very hot" on silencers.

During the same drive, the detective offered to help Bolatete with the mosque shooting. That offer, it seems, went too far. Bolatete immediately downplayed the seriousness of his plan, saying that it was just "wishful thinking." He refused the detective's offer of assistance, explaining that the reason he was turning him down was that the detective was healthy, young, and had a child.

Bolatete then started talking about his own family. He said that his eldest son, who had cerebral palsy, had always wanted to see this country, and he wanted to bring him to the United States and let him see it "before I [unintelligible]."[2]

After arriving at Bolatete's house, the two men talked outside the car. Bolatete said that the detective could use the silencer on the troublesome Muslim client who had refused to pay for his electrical work. When the detective suggested that Bolatete could use the silencer at the mosque, Bolatete said there was "[n]o need for a suppressor there" and that he "[didn't] need the suppressor." They parted ways without a goodbye, which made the detective think that Bolatete no longer trusted him.

The detective feared that he had offered too much help too fast and had blown his cover as a result. Frustrated, he called his supervisor. He told him that Bolatete had "no desire to own a silencer," and that the timeline for the mosque attack had changed because Bolatete wanted to bring his son to the United States first. The detective commented that the only angle they had left was to start sending Bolatete more anti-Muslim rhetoric by text message, "since he says he doesn't need a silencer or a rifle or anything like that."

---

[2] The word following "before I" is not audible on the recording. The detective testified that Bolatete told him he wanted to bring his son to the United States "before it happen[s]," and he reported to his supervisor that Bolatete said he wanted to bring his son here "before anything happens." The detective understood Bolatete to have been talking about bringing his son to this country before he committed the attack at the mosque.

The detective gave up on selling Bolatete a silencer, but he kept up contact with Bolatete, hoping to learn more about his plans for mass murder. Over the next few days, Bolatete texted the detective twice asking whether he had bought the rifle from his friend. The detective said that his friend was asking $300 for the rifle or $400 for the rifle and silencer, and he was looking into the licensing rules for the silencer.

On November 27 the detective visited Bolatete again at the liquor store. He didn't plan to mention the silencer. And he didn't have to because Bolatete brought it up, asking the detective if there was "[a]ny solution" yet to the problem of the Muslim client who hadn't paid his bill. When the detective said there wasn't, Bolatete suggested: "[Y]ou can use the silencer for that guy." Then Bolatete asked about the rifle. The detective said that he was still researching the registration and licensing rules for the silencer.

Bolatete volunteered: "If I were you, don't register the suppressor." That was the first time either of them had mentioned an <u>unregistered</u> silencer. Bolatete warned that if the detective registered the silencer, the police would be able to search his house without a warrant at any time to inspect the silencer. Then he asked whether the detective's friend had any more silencers to sell because he was interested in buying one, but only if it was unregistered.

8

The detective said that his friend had four or five more silencers and would not care if they went unregistered because he needed the money.  Bolatete reiterated that he "[did not] want to have any record about it."  He told the detective that when he arrived in the United States, he had started looking for a silencer right away because he had owned one in the Philippines.  He found one for sale at a gun store but was told that he needed a special license to buy it, and one condition of the license was that the police could search his house at any time. That condition was not one Bolatete was willing to agree to.

After that meeting, the detective and Bolatete continued to send text messages back and forth about the unregistered silencer.  In one particularly long text message, Bolatete said that he was thinking about putting the silencer on a gun he owned that was also unregistered because "it will be difficult to trace just in case."  He suggested that the right time to "hit" the (fictional) Muslim client would be around the Fourth of July or New Year's because the sound of the suppressed gunshots would "easily blend with the sound of the fireworks."  Bolatete warned the detective not to be seen arguing with the client so that the detective wouldn't be a "person of interest" after the "hit."  "Better still," Bolatete said, the detective and his boss could just run "surveillance" on the client to figure out what places he frequented.  Then the detective could point out the client so Bolatete could "take him for you guys."  At the end of the text message, Bolatete asked the detective to

delete it "so that it can't be found in your [cell phone] just in case investigators will try to 'connect' us."

The detective met Bolatete on December 1 in the parking lot of a sporting goods store to sell him the unregistered silencer. After the detective put the silencer in Bolatete's car, Bolatete paid him $100, and the two men went inside the store to shop for ammunition. When they left the store, they were met by a swarm of police officers who arrested Bolatete and pretended to arrest the detective.

### B. Procedural History

Bolatete was indicted in December 2017 on one count of receiving and possessing an unregistered firearm silencer in violation of 26 U.S.C. § 5861(d) and § 5871. He filed a motion to dismiss the indictment, contending that the National Firearms Act exceeds Congress' power to tax and therefore violates the Tenth Amendment both facially and as applied. The district court denied his motion because his contention was foreclosed by clear circuit precedent. The case proceeded to trial, and the jury found Bolatete guilty after deliberating for less than an hour and a half.

Bolatete's Presentence Investigation Report stated that he was a 70-year-old lawful permanent resident of the United States who immigrated here from the Philippines in 2009. The PSR noted that he suffers from high cholesterol, rheumatoid arthritis, diabetes, macular edema, and hypertension. It calculated a

base offense level of 18 under U.S.S.G. § 2K2.1(a)(5), and it applied a four-level enhancement under § 2K2.1(b)(6)(B) because Bolatete possessed the silencer with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense. The other felony offense was the planned assault or murder of the detective's fictional Muslim client. With an adjusted offense level of 22 and a criminal history score of zero, Bolatete's guidelines range was 41 to 51 months in prison.

Bolatete objected to the 4-level enhancement under § 2K2.1(b)(6)(B), and he and the government filed sentencing memoranda. The government asked the court to depart or vary upward from the guidelines range to the statutory maximum of ten years in prison because Bolatete had planned to carry out a mass shooting at a mosque, had confessed to committing an act of gun violence in the Philippines, had encouraged the detective to shoot a fictional Muslim client over a business dispute, and had later offered to shoot the client himself. Bolatete pointed to his age and poor health in requesting a downward variance to 9 months imprisonment to be followed by his uncontested removal from the United States.

At sentencing the district court overruled Bolatete's objection to the 4-level § 2K2.1(b)(6)(B) enhancement, finding that the government had proved by a preponderance of the evidence that Bolatete intended to use the silencer to assault or kill the detective's fictional Muslim client. The court varied upward to a

11

sentence of 60 months in prison in order to further the goals of deterrence and protecting the public. And the court made clear that it would have imposed the same 60-month prison sentence even if it had not applied the 4-level sentence enhancement under § 2K2.1(b)(6)(B).

## II. DISCUSSION

Bolatete raises six issues. He contends that: 1) the National Firearms Act, 26 U.S.C. ch. 53, is unconstitutional because it exceeds Congress' power to tax and therefore violates the Tenth Amendment; 2) if the Act is a tax, it is unconstitutional because it taxes the exercise of Second Amendment rights; 3) the Act violates the Second Amendment, the protections of which extend to silencers; 4) the evidence at trial was insufficient to support the jury's finding that he was not entrapped; 5) the district court erred by imposing a 4-level sentence enhancement under U.S.S.G. § 2K2.1(b)(6)(B); and 6) his 60-month sentence is substantively unreasonable.

## A. The Taxing Power Issue

Bolatete's first contention is that the National Firearms Act in general, and 26 U.S.C. § 5861(d) in particular, are unconstitutional both facially and as applied because they exceed Congress' power to tax. "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." Bond v. United States, 572 U.S. 844, 854 (2014). Congress does not have a general police power that would allow it to "punish felonies generally." Id.

12

(quotation marks omitted).  Instead, every criminal penalty that Congress enacts must be grounded in one of its enumerated powers, such as the power to regulate interstate commerce or the power to lay and collect taxes.  Id.; see U.S. Const. Art. I, § 8.

The National Firearms Act, and the criminal penalty for violating it, are grounded in Congress' power to tax.  See United States v. Spoerke, 568 F.3d 1236, 1245 (11th Cir. 2009).  The Act creates a comprehensive taxation and registration scheme for certain statutorily defined "firearm[s]," which include silencers.  See 26 U.S.C. § 5845(a).  One part of the Act requires that any person who transfers a firearm to someone else must pay a $200 transfer tax and must register the firearm to the transferee.  See 26 U.S.C. §§ 5811(a), 5841.[3]  It is the transferor, not the transferee, who is obligated to pay the tax and to register the firearm.  See id. §§ 5811(b), 5841(b).[4]  Section 5861(d), the section that Bolatete was convicted of

---

[3] The transfer tax is only $5 for firearms classified as "any other weapon" under 26 U.S.C. § 5845(e).  26 U.S.C. § 5811(a).  A silencer does not fit the definition of "any other weapon," so the $5 rate is irrelevant to Bolatete's as-applied challenge.  See 26 U.S.C. § 5845(e).

[4] A prospective transferor registers the silencer and pays the tax by filing an application with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) before transferring the firearm.  See 26 U.S.C. § 5812(a); 27 C.F.R. §§ 479.11, 479.84.  The transfer tax is payable through the purchase of a designated tax stamp.  26 U.S.C. §§ 5811(c), 5812(a).  The Act says that the $200 tax stamp must be "affixed to the original application form," id. § 5812(a), but in practice, the applicant sends the $200 payment to the ATF along with his application and the ATF affixes the tax stamp after the application is approved.  See 27 C.F.R. § 479.84(d); Application for Tax Paid Transfer and Registration of Firearm, Bureau of Alcohol, Tobacco, Firearms, and Explosives, https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download (last visited Sept. 16, 2020).  A copy of the approved application form is then returned to the transferor and must be given, along with the firearm, to the transferee.  27 C.F.R. § 479.84(d); Application for Tax Paid Transfer and

violating, prohibits any person from "receiv[ing] or possess[ing] a firearm which is not registered to him."  The maximum penalty for violating any provision of the Act, including § 5861(d), is ten years in prison and a $10,000 fine.  Id. § 5871.

According to Bolatete, the National Firearms Act is not a tax but instead a public safety measure thinly disguised as a tax.  See United States v. Freed, 401 U.S. 601, 603, 609 (1971) (describing the Act as "a regulatory measure in the interest of the public safety").  Bolatete concedes that a law does not stop being a valid tax measure just because it also serves some other goal besides raising revenue.  "[E]very tax is regulatory to some extent."  United States v. Ross, 458 F.2d 1144, 1145 (5th Cir. 1972)[5]; see Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB), 567 U.S. 519, 567 (2012) ("[T]axes that seek to influence conduct are nothing new.").  In deciding whether a law is a valid tax measure we take a "practical" approach that does not depend on how the law is labeled.  See NFIB, 567 U.S. at 565.  We consider "whether on its face the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose." Ross, 458 F.2d at 1145.  Bolatete contends that the tax does not operate as a

---

Registration of Firearm, supra.  It provides the transferee with proof that the firearm was properly registered and the transfer tax was paid.  A person who possesses a firearm must "retain proof of registration which shall be made available to any ATF officer upon request."  27 C.F.R. § 479.101(e); accord 26 U.S.C. § 5841(e).

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

revenue generating measure and the attendant regulations are not in aid of a revenue purpose.

He argues that § 5861(d), which is one of the Act's "attendant regulations," see Ross, 458 F.2d at 1145, does not aid any revenue-raising purpose because it punishes the recipient of an unregistered firearm even though the recipient has no obligation or opportunity to pay the transfer tax. He also argues that the Act does not "look[ ] like a tax," NFIB, 567 U.S. at 563, or operate like one on its face because: the Department of Justice enforces the Act, not the Department of the Treasury or the Internal Revenue Service; the criminal penalties for violating the Act are disproportionately severe for a tax; and the $200 transfer fee has no connection to raising revenue. Bolatete says that the Act exceeds Congress' power to tax and for that reason violates the Tenth Amendment.[6]

Generally, we review a district court's denial of a motion to dismiss the indictment only for abuse of discretion. United States v. Palomino Garcia, 606 F.3d 1317, 1322 (11th Cir. 2010). "When a defendant challenges the constitutionality of a statute, however, the review is de novo." United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1377 n.3 (11th Cir. 2011).

---

[6] The Tenth Amendment says: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X.

15

Bolatete's contention runs headlong into two decisions that bind us.[7] The first decision is Ross, 458 F.2d 1144. The defendant in that case, like Bolatete in this one, was charged under § 5861(d) for possessing an unregistered firearm. Id. He possessed two Molotov cocktails, which are plainly within the Act's definition of "destructive device[s]," which in turn is included in the definition of "firearm" and therefore taxable under the Act.[8] Id. at 1144–46; see 26 U.S.C. § 5845(a), (f).

The defendant in Ross argued that the transfer tax was unconstitutional as applied to Molotov cocktails because it was a "prohibitory statute" that exceeded Congress' power to tax. Ross, 458 F.2d at 1145. Our predecessor Court rejected that argument, reasoning that § 5861(d) "is part of the web of regulation aiding enforcement of the transfer tax provision in § 5811." Id. The Court observed: "Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." Id. The penalty that § 5861(d) imposes on

---

[7] The government argues that Bolatete's contention is also contrary to Supreme Court precedent. The government points to Sonzinsky v. United States, 300 U.S. 506 (1937), where the Supreme Court upheld a related part of the National Firearms Act, an annual tax on firearms dealers, as a valid exercise of the taxing power. Id. at 513. The Sonzinsky decision did not decide the issues before us, however, because it did not involve the transfer tax and because the Act was markedly different in 1937 than it is today. See id. at 512 ("As the conviction for nonpayment of the [dealer tax] has alone been sustained, it is unnecessary to inquire whether the [transfer] tax levied by section 3 and the regulations pertaining to it are valid."); see also Pub. L. No. 90-618, § 201, 82 Stat. 1213 (1968) (substantially amending the Act).

[8] According to the indictment in the Ross case, Molotov cocktails are "incendiary devices . . . consisting of a quart glass bottle . . . containing a flammable liquid and having a cloth wick in the mouth of [the] bottle." 458 F.2d at 1144 n.1 (quotation marks omitted).

those who possess and receive certain unregistered firearms is a valid exercise of the taxing power, the Court held, because that penalty "ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax." Id.

The second decision that binds us in this matter is Spoerke, 568 F.3d 1236. In that case the defendant was charged with, among other things, possessing an unregistered pipe bomb (quite obviously a destructive device) in violation of § 5861(d). See id. at 1241–42. The defendant facially challenged the constitutionality of the National Firearms Act on the ground that it exceeds Congress' power to tax. Id. at 1245. Relying on Ross, we held unequivocally that "[t]he National Firearms Act is facially constitutional" and that "Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." Id. (quotation marks omitted). The defendant also challenged the Act as applied to him because "pipe bombs are unlawful and cannot be taxed." Id. We rejected that argument as well, explaining that "[t]he unlawfulness of an activity does not prevent its taxation." Id. at 1245–46  (quotation marks omitted).

Bolatete's arguments are clearly foreclosed by Spoerke.  It was true when that case was decided, just as it is true now, that the Department of Justice enforces the Act; that the maximum penalty for a violation is ten years in prison; and that

the Act imposes only a $200 tax on firearm transfers.[9]  Yet in <u>Spoerke</u> we upheld

the Act both facially and as applied as an exercise of Congress' taxing power.  536

F.3d at 1245–46.  Under <u>Spoerke</u> we are bound to reach the same conclusion here.

 Bolatete insists, however, that he has a way around the <u>Spoerke</u> decision.

At oral argument he tried to distinguish it by pointing out that in <u>Spoerke</u> the

defendant created the pipe bomb he was charged with possessing and therefore did

not "receive" it.[10]  That means, Bolatete said, that the defendant in <u>Spoerke</u> had no

occasion to raise one of the arguments Bolatete raises here: that § 5861(d) does not

aid any revenue-raising purpose because it punishes the recipient of an

unregistered firearm even though the recipient has no obligation or opportunity to

pay the transfer tax.

But that's a distinction without a difference.  The defendant in <u>Ross</u>, like the

defendant in <u>Spoerke</u>, was charged under § 5861(d) for possessing unregistered

---

[9] The Bureau of Alcohol, Tobacco, Firearms, and Explosives, which is responsible for enforcing the Act, was transferred from the Department of the Treasury to the Department of Justice in January 2003.  <u>See</u> ATF History Timeline, <u>Bureau of Alcohol, Tobacco, Firearms and Explosives</u>, https://www.atf.gov/our-history/atf-history-timeline (last visited Sept. 16, 2020). The penalty for violating the Act has remained unchanged since 1968.  <u>See</u> Gun Control Act of 1968, Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1234.  And the amount of the transfer tax has been fixed at $200 since the Act was first enacted in 1934.  <u>See</u> National Firearms Act, Pub. L. No. 73-474, § 3, 48 Stat. 1236, 1237 (1934).  All of those events preceded <u>Spoerke</u>, which was decided in 2009.  <u>See</u> 568 F.3d 1236.

[10] In his briefs, Bolatete did not try to distinguish <u>Spoerke</u>.  Instead he "recogniz[ed]" <u>Spoerke</u> and asked us to "revisit" it in light of his arguments on appeal.  We cannot do that because we are bound by <u>Spoerke</u> under the prior panel precedent rule.  <u>See</u> <u>United States v. Steele</u>, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc).

firearms, not for receiving them.  See Ross, 458 F.2d at 1144.  In upholding the

defendant's conviction in Ross, we did not suggest that the defendant had a chance

to pay the transfer tax or that a chance to pay it is required for a § 5861(d)

conviction to be valid.  See id. at 1144–46.  Instead, we held that § 5861(d) is a

valid regulation "aiding enforcement of the transfer tax provision in § 5811"

because it "discourages the transferor on whom the tax is levied from transferring a

firearm without paying the tax."  Id. at 1145.  In other words, § 5861(d) aids a

revenue-raising purpose even though it punishes possessors and transferees who

have no obligation or opportunity to pay the transfer tax themselves.  See id.  That

holding squarely forecloses Bolatete's argument.

Even if Bolatete could somehow clear the legal hurdles of Ross and Spoerke,

he still could not get over a factual one.  Although Bolatete's taxing power

challenge is both facial and as applied, at oral argument he tried to distinguish from

Spoerke only the as-applied aspect of his challenge.  To bring a successful as-

applied challenge, he would have to show that the Act is "unconstitutional on the

facts of [his] particular case."  Harris v. Mexican Specialty Foods, Inc., 564 F.3d

1301, 1308 (11th Cir. 2009) (quotation marks omitted).  In this case, Bolatete

asked the detective to sell him an unregistered silencer and insisted that there be no

paper trail.  The evidence establishes that Bolatete would not have registered the

silencer he bought, even if he could have.  As a result, he cannot defeat the Act's

application to him on the ground that he never had a chance to register the silencer that he would not have registered anyway or to pay the transfer tax that he would not have paid anyway.

Because Bolatete's taxing power challenge is contrary to our precedent and unsupported by the facts of this case, we reject it.

## B.  The Unpreserved Constitutional Challenges

Bolatete raises two constitutional issues for the first time on appeal.  We review only for plain error a district court's failure to rule without a motion that a statute is unconstitutional.  See United States v. Candelario, 240 F.3d 1300, 1306 (11th Cir. 2001).  To prevail under plain error review, Bolatete must show that the district court made an error, that the error was plain, and that it affected his substantial rights.  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).  If he carries that burden, we have discretion to reverse the district court's judgment, but only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quotation marks omitted).

## 1.  The "Fee Jurisprudence" Issue

The first unpreserved constitutional issue comes in Bolatete's challenge to the National Firearms Act based on the Supreme Court's "fee jurisprudence" cases. In a pair of decisions in the 1940s, the Supreme Court held that the government "may not impose a charge for the enjoyment of a right granted by the federal

constitution," Murdock v. Pennsylvania, 319 U.S. 105, 113 (1943), although it may collect a fee to defray administrative costs associated with the exercise of a constitutional right, Cox v. New Hampshire, 312 U.S. 569, 576–77 (1941). Those principles are most often applied in the First Amendment context. See, e.g., Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1314–15 (11th Cir. 2003) (holding that "a licensing fee on adult entertainment establishments is controlled by Cox and Murdock and must be reasonably related to recouping the costs of administering the licensing program"). Bolatete argues that we should apply the principles of those two administrative fee decisions to the Second Amendment as well. If we do, he says, we will have to hold the National Firearms Act unconstitutional because it imposes a tax on firearm transfers that is unrelated to any administrative costs associated with the exercise of Second Amendment rights.

Bolatete contends that he preserved this issue for de novo review here when he argued to the district court that the Act exceeds Congress' taxing power because it is not actually a tax; his theory is that argument implicitly "encompasse[d] his alternative argument . . . that even if the [Act] is a tax, it is an unconstitutional tax." But constitutional challenges are not all-encompassing, they are not interchangeable, and one does not serve as a placeholder for others. Attacking a statute on one ground in the district court does not entitle a litigant to de novo review of an attack on another ground in a court of appeals.

At no point in his motion to dismiss the indictment did Bolatete mention Murdock, Cox, the Second Amendment, or the Supreme Court's fee jurisprudence principles. His contention in the district court was that the Act is not a tax but actually a regulatory law disguised as a tax. His contention in this Court is that if the Act is a tax, it is an unconstitutional tax because it imposes impermissible fees on the exercise of Second Amendment rights. Bolatete's motion to dismiss did not bring that issue to the attention of the district court and provide it "with an opportunity to avoid or correct any error" that it might have made in that respect. United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007); see Fed. R. Crim. P. 52(b) (stating that plain error review applies to errors that were "not brought to the court's attention"). Because Bolatete did not preserve the issue, we review only under the plain error rule.

Bolatete's contention can't meet the strictures of plain error review. Our Court has not decided whether it is appropriate to apply the fee jurisprudence of Murdock and Cox in the context of Second Amendment rights. Nor has the Supreme Court. The absence of a decision by either Court rules out a holding that the asserted error was "plain" because "there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." United States v. Lange, 862 F.3d 1290, 1296 (11th Cir. 2017) (quoting United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003)). As a result, Bolatete cannot

22

establish that the district court committed plain error by not bringing up this issue on its own and ruling in his favor on it.

### 2. The Second Amendment and Silencers Issue

The second constitutional issue Bolatete offers up for the first time in this appeal is his claim that the National Firearms Act's application to silencers violates the Second Amendment.  We use a two-step inquiry when deciding a Second Amendment issue.  United States v. Focia, 869 F.3d 1269, 1285 (11th Cir. 2017).  First, we ask if the restricted activity is within the scope of protection of the Second Amendment in the first place.  Id.  If it is, we apply "an appropriate form of means-end scrutiny."  Id.

The Supreme Court has held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  District of Columbia v. Heller, 554 U.S. 570, 625 (2008).  Bolatete asserts that silencers are entitled to Second Amendment protection because they are typically possessed by law-abiding citizens for lawful purposes.  He cites a slew of statistics in support of that point.  Then he argues that under any level of means-end scrutiny, the Act's restrictions on silencers violate the Second Amendment.

Once again, the strictures of plain error review defeat his belated contention.  See Lange, 862 F.3d at 1296.  Neither this Court nor the Supreme Court has ever

held that silencers are "typically possessed by law-abiding citizens for lawful purposes." Heller, 554 U.S. at 625. In fact, neither Court has ever decided the preliminary question of whether silencers are "Arms" for Second Amendment purposes. U.S. Const. Amend. II (establishing the right to keep and bear "Arms"). Because there is no on-point precedent of the Supreme Court or this Court supporting Bolatete's belatedly asserted position, the district court's not raising the issue on its own and striking down the statute cannot be plain error.

### C. The Entrapment Defense

Bolatete also contends that the evidence was insufficient to support the jury's finding that he was not entrapped. "We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor." United States v. Deason, 965 F.3d 1252, 1262 (11th Cir. 2020) (quotation marks omitted).

The defense of entrapment has two elements: "(1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010) (quotation marks omitted). The defendant bears the initial burden of production on inducement, which is a legal question for the court to decide. Id. at 1332–33; United States v. Ryan, 289 F.3d 1339, 1343–44 (11th Cir. 2002). If the defendant meets his burden

by showing "some evidence" of inducement, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. See Ryan, 289 F.3d at 1343. Unlike inducement, predisposition is a factual question for the jury. Id. at 1344.

The inducement element of the entrapment defense was not disputed at trial: the government agreed with Bolatete that the jury should be instructed on entrapment, and it was. Because the defense was submitted to and rejected by the jury on the predisposition issue, "our review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." United States v. Brown, 43 F.3d 618, 622 (11th Cir. 1995). "[T]he predisposition inquiry is a purely subjective one which asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's officers or agents." Id. at 624.

Bolatete argues that no reasonable jury could have found, as the one in this case did, that he was predisposed to buy an unregistered silencer. He focuses on his initial refusal to buy a silencer. When the detective first offered to sell one, Bolatete did not explicitly accept or reject the offer but instead criticized the silencer they were test firing. Then in the car he said that there was "no need" for the detective to buy a silencer with the rifle because they were not going hunting,

and he warned that the police were "very hot" on silencers.  After the car ride Bolatete told the detective not once but twice that he did not need a silencer for the mosque shooting.  The detective clearly got the message.  He called his supervisor afterward and reported that Bolatete had "no desire to own a silencer" and "sa[id] he doesn't need a silencer or a rifle or anything like that."

Those facts are favorable to Bolatete.  So much so that if he had continued with that attitude and conduct, Bolatete could not have been charged, much less convicted, for receiving and possessing an unregistered silencer.  But there was other evidence, enough of it that a reasonable jury could find that Bolatete was predisposed to receive and possess an unregistered silencer.

During the investigation, Bolatete was the first person to bring up silencers, and he showed more than once that he knew a lot about them.  He told the detective that he had owned a silencer in the Philippines and had used it to shoot someone with whom he had a dispute.  When Bolatete arrived in the United States, he had immediately started looking for a silencer.

During his conversations with the detective, Bolatete was the first one to mention an <u>unregistered</u> silencer.  That fact matters.  Owning a silencer generally is not a crime, but owning an unregistered silencer is.  It was Bolatete who suggested out of the blue that the detective should not register the silencer he was buying from the friend.  And it was Bolatete who said, without being prompted,

that he too wanted to buy a silencer from the detective's friend if, but only if, it was unregistered. He said that he didn't buy a silencer when he first came to the United States because he thought that registering it would give the police authority to search his home at will and without a warrant.

Based on all of the evidence, a reasonable jury could have found, as the one in this case did, that Bolatete was ready and willing to buy an unregistered silencer "absent any contact with the government's officers or agents." Brown, 43 F.3d at 624.

### D. The Sentencing Issues

Bolatete raises two issues involving his sentence. First, he contends that the district court erred by imposing an enhancement under U.S.S.G. § 2K2.1(b)(6)(B) after finding that he possessed the silencer with intent to use it in connection with another felony offense. The effect of that enhancement was to increase the guidelines range from 27 to 33 months in prison up to a range of 41 to 51 months. We need not decide whether that enhancement was properly applied because the court stated that it did not really matter because the court would have varied upward from either range to impose a 60-month sentence. Under the Keene rule, as long as Bolatete's sentence would have been substantively reasonable without the enhancement, a question we will address momentarily, any error the court might have made in imposing the enhancement was harmless. See United States v.

Keene, 470 F.3d 1347, 1349 (11th Cir. 2006); see also United States v. McLellan,
958 F.3d 1110, 1116 (11th Cir. 2020); United States v. McNair, 605 F.3d 1152,
1230 (11th Cir. 2010); United States v. Lozano, 490 F.3d 1317, 1324 (11th Cir.
2007).

Second, Bolatete contends that his sentence is substantively unreasonable.
We review the substantive reasonableness of a sentence only for abuse of
discretion. Gall v. United States, 552 U.S. 38, 46 (2007). A district court abuses
its discretion and imposes a substantively unreasonable sentence when it "(1) fails
to afford consideration to relevant factors that were due significant weight,
(2) gives significant weight to an improper or irrelevant factor, or (3) commits a
clear error of judgment in considering the proper factors." United States v. Irey,
612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quotation marks omitted). We
will vacate a sentence as substantively unreasonable only if we "are left with the
definite and firm conviction that the district court committed a clear error of
judgment in weighing the § 3553(a) factors by arriving at a sentence that lies
outside the range of reasonable sentences dictated by the facts of the case." Id. at
1190 (quotation marks omitted).

Bolatete argues that the court failed to consider two factors that it should
have: his age and failing health. And, he asserts, it committed a clear error of
judgment by overemphasizing the deterrence and protection of the public factors.

Finally, he argues that the degree of the court's variance from the guidelines range was excessive.

The district court didn't fail to consider Bolatete's age and health. The court expressly stated that it had taken into account his age and health, which is why it did not grant the government's request for a statutory maximum sentence. See Doc. 93 at 15 ("I've taken into consideration the Defendant's age, the Defendant's health. And I think that ten years was too much."). As for the weight it gave to deterrence and protection of the public, that was a matter within the court's discretion. See United States v. Overstreet, 713 F.3d 627, 638 (11th Cir. 2013); see also United States v. Gomez, 955 F.3d 1250, 1257 (11th Cir. 2020) ("In fashioning a sentence, the district court enjoys discretion to give greater weight to one or more factors than to the others."); United States v. Goldman, 953 F.3d 1213, 1222 (11th Cir. 2020) ("When it comes to weighing the § 3553(a) factors, the district court enjoys great discretion."). We review that part of the court's reasoning only to determine whether the court "committed a clear error of judgment," Irey, 612 F.3d at 1190, and it did not.

The court based the 60-month sentence on "what went on between [Bolatete] and the undercover officer," and those goings-on gave the court plenty of reasons to be concerned about public safety and deterring Bolatete and others like him from committing future crimes. Bolatete told the detective he was planning a mass

murder, and related how he had taken an actual step toward committing that act by scoping out the site of the attack; he volunteered that he had shot someone in the Philippines over a dispute; he offered to assault or murder with a firearm the detective's fictional Muslim client; and at the shooting range he showed the detective that he knew how to use a firearm.

Finally, the extent of the variance imposed by the district court was reasonable even without considering the § 2K2.1(b)(6)(B) enhancement and higher guidelines range that came from it. Without the enhancement, Bolatete's guidelines range would have been 27 to 33 months in prison. The sentence the court actually imposed was 60 months in prison, nearly twice 33 months, which was the high end of the unenhanced guidelines range. But it was also only half of the statutory maximum sentence of 120 months. See 26 U.S.C. § 5871; see also United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008) (holding that a sentence that is well below the statutory maximum is a factor indicating it is not unreasonably long). It is true that "a major variance does require a more significant justification than a minor one." Irey, 612 F.3d at 1196. But, even assuming the variance from 33 months to 60 months was "a major variance," the district court had plenty of justification here.

For all of those reasons, a 60-month sentence is reasonable in light of the need to protect the public and to deter Bolatete from committing future crimes.

30

Given the sentencing judge's statement that he would have imposed the same sentence anyway, the issue involving the § 2K2.1(b)(6)(B) enhancement is moot under the <u>Keene</u> rule. The upward variance sentence is not substantively unreasonable even considering the lower guidelines range that would have applied but for the enhancement.

## III.  CONCLUSION

Bolatete's conviction and sentence are **AFFIRMED.**